# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| ANTHONY J. GREEN, SR.; GFD CONSTRUCTION, INC., a Florida corporation; and GFD SANDPIT, INCORPORATED, a Florida corporation, | |
| Plaintiffs, | |
| v. | Case No. _____ |
| THOMAS DAVID KING, a/k/a THOMAS D. KING, a/k/a TOM KING; KAT ENTERPRISES OF PENSACOLA, INC., d/b/a PENSACOLA SPECIALTY PAWN, d/b/a PENSACOLA TITLE LOANS, d/b/a KAT CHECK CASHING, d/b/a SPECIALTY PAWN; WEST FLORIDA AUTO EXCHANGE, INC., d/b/a VIKING RESEARCH, d/b/a DAMAGE FREE RECOVERY, d/b/a DFR INVESTIGATIONS; KTTTC INVESTMENTS, INC., a Florida corporation; and TERRA GULF COAST, LLC, a Florida limited liability company; | |
| Defendants. | |

## **COMPLAINT**

For their Complaint against the Defendants, Plaintiffs ANTHONY J.

GREEN, SR. ("**Green**"), GFD CONSTRUCTION, INC. ("**GFD Construction**"),

and GFD SANDPIT INCORPORATED ("**GFD Sandpit**") state as follows:

## INTRODUCTION

1.      This case arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("**Civil RICO**"), as well as under the laws of the State of Florida and the State of Alabama.

2.      Defendant Thomas David King, a/k/a Thomas D. King, a/k/a Tom King ("**King**"), controls and leads an illegal title lending business and money services business. King, the other named Defendants, and other third parties (the "**King Enterprise**"), have engaged in a criminal enterprise through a pattern of racketeering activities that includes violations of federal money laundering statutes, mail fraud, transportation and sale of stolen vehicles, and violations of the Bank Secrecy Act.

3.      For nearly 20 years, King has used his illegal businesses to defraud numerous victims, including the Plaintiffs. King's illegal title lending and illegal money services businesses operate across state lines between Florida and Alabama.

4.      King is no stranger to litigation, and he has utilized litigation extensively to perpetuate his fraudulent schemes. Indeed, while bragging about the damages he has inflicted on the Plaintiffs, King has boasted publicly that he has "judges in his pocket."

5.      The King Enterprise has existed and operated since at least 2004 and continues to this day. In that time, the King Enterprise has devised multiple

schemes comprised of components intertwined with King's legitimate business interests, and the King Enterprise's activities demonstrate a substantial risk of continued criminal activity.

6.    The King Enterprise operates in interstate commerce and its activities substantially affect interstate commerce.

7.    Since 2004, the King Enterprise has committed the following crimes:

    a.    Bankruptcy fraud under 18 U.S.C. § 152;

    b.    Mail fraud under 18 U.S.C. § 1341;

    c.    Racketeering under 18 U.S.C. § 1952;

    d.    Money laundering under 18 U.S.C. § 1956;

    e.    Engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957;

    f.    Unlicensed money transmitting under 18 U.S.C. § 1960;

    g.    Transportation of stolen vehicles under 18 U.S.C. § 2312;

    h.    Sale or receipt of stolen vehicles under 18 U.S.C. § 2313;[1] and

    i.    Violations of the Currency and Foreign Transactions Reporting Act, or the Bank Secrecy Act, under 31 U.S.C. §§ 5311-5330.

---

[1] The elements of the offense defined in 18 U.S.C. § 2313 are that the defendants: (1) receive, possess, conceal, store, barter, sell or dispose of; (2) a stolen motor vehicle or aircraft; (3) which has crossed a state or United States boundary after being stolen; and (4) knowing the same to have been stolen.

8.      The Plaintiffs have been damaged by the King Enterprise because King and his co-conspirators have directly and intentionally interfered with the Plaintiffs' property and business. The King Enterprise has unlawfully imposed on the Plaintiffs opportunity costs resulting directly from the enterprise's criminal activity because the Plaintiffs have been forced to defend against the King Enterprise's illegal schemes, incurring significant attorneys' fees and expenses and depriving the Plaintiffs of the opportunity to invest those funds elsewhere.

## NATURE OF THE SCHEMES

9.      The King Enterprise devised schemes to circumvent Florida law by operating a title lending business in the State of Alabama.

10.      Generally, title lending, pawn, and money services businesses are cash intensive businesses that invite abuse. In 2006, there were no licensed title loan lenders licensed in the State of Florida.[2] As of 2019, there are only five licensed title loan lenders in the State of Florida.[3]

11.      To accomplish its scheme, KAT Enterprises acquired real property situated at 34612 US-98, Lillian, AL 36549, where it operates Pensacola Title Loan

---

[2] Annesley H. DeGaris, *Sharks in the Water: The Problem of Car Title Loans*, 27 Ala. Ass'n Just. J. 59, 59 (2007).
[3] Florida Office of Financial Regulation, *Registration Data Download: Title Loan Lenders* (2019), https://www.flofr.com/sitePages/DownloadRegistrationData.htm.

less than 1/2 mile from the Alabama/Florida state line, as shown in the following image:



12.   KAT Enterprises' principal place of business is located at 6428 Pensacola Boulevard, Pensacola, Florida 32505, where it operates alongside Pensacola Indoor Shooting Range and West Florida Auto Exchange.

13.   Although KAT Enterprises is licensed in Alabama as a pawnbroker and is authorized to engage in title loan transactions in Alabama, KAT Enterprises is not licensed as a title loan lender in the State of Florida. In fact, no member of

the King Enterprise is licensed to engage in the title loan lending business in Florida.

14.     To achieve what it is prohibited from doing in Florida, the King Enterprise utilizes KAT Enterprises' pawnshop license in Alabama to engage in title loan lending activities across state lines and in interstate commerce. On information and belief, the King Enterprise makes title loans in Florida and documents those loans in such a manner as to make it appear that the title loans were made in Alabama, in violation of the laws of Florida and Alabama.

15.     In addition, the King Enterprise has long engaged in money transmitting and money services businesses in violation of federal and state law. For nearly 20 years, the King Enterprise has operated illegal check cashing and pawn businesses in Florida and Alabama; however, no member of the King Enterprise has ever registered with the Department of the Treasury as a money transmitter or money services business, as required by federal and state law.

16.     In addition, the King Enterprise has actively conspired, acted, and engaged in ongoing and systematic efforts to defraud others, including the Plaintiffs, in violation of the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. §§ 895.01 to .06; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.20-.213; the Florida Title Loan Act, Fla. Stat. §§ 537.001 to .018; the Florida Pawn Brokering Act, Fla. Stat. § 539.001; the

Alabama Pawnshop Act, Ala Code. §§ 5-19A-1 through 5-19A-20; and the

Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 to -15.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

1332 and 1367(a) and 18 U.S.C. § 1964(c).

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2)

because (a) a substantial part of the events or omissions giving rise to the

Plaintiff's claims occurred in this district, or (b) a substantial part of property that

is the subject of the action is situated in this district. In addition, venue is proper in

this district pursuant to 18 U.S.C. § 1965(a)-(b) because each defendant resides, is

found, has an agent, or transacts her or his or its affairs in this district, and because

the ends of justice so require.

## PARTIES AND RELEVANT NON-PARTIES

### A.    *Plaintiffs*

19.    Green is a citizen of the State of Florida. He resides in Pensacola,

Escambia County, Florida. Green is a "person" as defined in 18 U.S.C. § 1961(3)

and 1964(c).

20.    GFD Construction is a corporation incorporated under the laws of the

State of Florida, and its principal place of business is in Escambia County, Florida.

GFD Construction is a "person" as defined in 18 U.S.C. § 1961(3) and 1964(c).

21.     GFD Sandpit is a corporation incorporated under the laws of the State of Florida, and its principal place of business is in Escambia County, Florida. GFD Sandpit is a "person" as defined in 18 U.S.C. § 1961(3) and 1964(c).

### B.     Defendants

22.     Defendant THOMAS DAVID KING, a/k/a THOMAS D. KING, a/k/a TOM KING ("**King**") is a citizen of the State of Florida. He resides in Pensacola, Escambia County, Florida.

23.     Defendant KAT ENTERPRISES OF PENSACOLA, INC., d/b/a PENSACOLA SPECIALTY PAWN, d/b/a PENSACOLA TITLE LOANS, d/b/a KAT CHECK CASHING, d/b/a SPECIALTY PAWN ("**KAT Enterprises**"), is a Florida corporation, and its principal place of business is in Pensacola, Escambia County, Florida.

24.     Defendant WEST FLORIDA AUTO EXCHANGE, INC., d/b/a VIKING RESEARCH, d/b/a DAMAGE FREE RECOVERY, d/b/a DFR INVESTIGATIONS ("**West Florida**"), is a Florida corporation, and its principal place of business is in Pensacola, Escambia County, Florida.

25.     Defendant KTTTC INVESTMENTS, INC. ("**KTTTC Investments**"), is a Florida corporation, and its principal place of business is in Pensacola, Escambia County, Florida.

26.     Defendant TERRA GULF COAST, LLC ("**Terra Gulf Coast**"), is a Florida limited liability company, and its principal place of business is in Pensacola, Escambia County, Florida.

### C.     *Non-Party Co-Conspirators*

27.     Certain other non-party individuals and business entities, including King's lawyers, customers, and business partners, played roles, direct or indirect, in the scheme to defraud the Plaintiffs and others. Foremost among these individuals and business entities are the following:

28.     Pensacola Indoor Shooting Range, LLC, a Florida limited liability company ("**Pensacola Indoor Shooting Range**"), owns the property at 6428 Pensacola Boulevard, Pensacola, Escambia County, Florida (the "**Pensacola Property**"). Since 2015, the King Enterprise has operated primarily from the Pensacola Property. Pensacola Indoor Shooting Range has funded some of the King Enterprises' schemes and efforts to avoid liability for its wrongdoing. On information and belief, King is the sole shareholder of Pensacola Indoor Shooting Range.

29.     Charles Anthony Bettis ("**Bettis**") is a former partner of King's in TAT Enterprises and successor to King's interests in TAT Enterprises. Along with King and the other Defendants, Bettis conspired with King and the other Defendants to:

a.     Divest Green of his interests in TAT Enterprises;

b.      Allow the entry of a sham judgment in favor of West Florida to ensure King would reap the benefits of TAT Enterprises' lucrative contracts;

c.      Assign to West Florida TAT Enterprises' judgment lien encumbering certain real property in Escambia County, Florida, to force the Board of County of Commissioners of Escambia County, Florida, to pay hundreds of thousands of dollars to West Florida to the exclusion of the Plaintiffs.

30.     Mr. Mark A. Bednar ("**Mr. Bednar**") and Mark A. Bednar, P.A. have represented the King Enterprise in various cases in state and federal court in which the King Enterprises has actively endeavored to consummate its fraudulent scheme against the Plaintiffs and others. In addition, Mr. Bednar has in the past and continues to conspire with King to injure the Plaintiffs, utilizing abusive litigation tactics and assisting King in the filing of sham pleadings in state and federal court.

31.     Mr. Gregory Green ("**Gregory Green**") is the sole shareholder and President of GB Green Construction Management & Consulting, Inc., a Florida corporation. Gregory Green conspired with King and assisted in fraudulent execution of motor vehicle titles in connection with the King Enterprise's illegal title loan scheme. Moreover, Gregory Green actively conspired with King and others to defraud Empire Truck Sales, LLC, as described in this Complaint. Gregory Green was Plaintiff Green's stepson.

32.     Mr. Barry Kidd is a licensed real estate associate holding License No. 3011721 issued by the Florida Real Estate Commission. Mr. Kidd has asserted frivolous claims against Plaintiff Green in an effort to damage Green's standing and reputation in the community. For example, in 2016, Barry Kidd filed that certain civil action styled *Barry D. Kidd v. Anthony J. Green, Sr.*, Circuit Court of Escambia County, Florida, Case No. 2016-DR-001762, in which Kidd falsely accused Plaintiff Green of stalking and domestic violence. Kidd's allegations were so blatantly fabricated that within an hour after the case was filed, the court rejected Kidd's claims and denied him any relief. Furthermore, Kidd has conspired with King to divest the Plaintiffs of their assets by asserting false and scurrilous allegations against the Plaintiffs in an effort to coerce the Plaintiffs into liquidating their valuable assets. Kidd continues to conspire with King to injure the Plaintiffs.

33.     The King Enterprise has conspired with other non-parties whose identities are unknown at present, but Plaintiffs anticipate learning those identities through discovery in this case.

### **FACTS COMMON TO ALL COUNTS**

34.     The King Enterprise utilized its illegal schemes to entice and then victimize the Plaintiffs. Through its illegal title lending business and check cashing businesses, the King Enterprise unlawfully obtained ownership of assets of one or more of the Plaintiffs. The King Enterprise cashed numerous checks drawn on one

or more of the Plaintiffs' accounts. Over time, the King Enterprise advanced cash to one or more of the Plaintiffs as undocumented, illegal loans, gaining influence and sway over the Plaintiffs. In 2006, King sought to capitalize on that influence.

### A.     *The King Enterprise defrauded the Plaintiffs with an eye toward obtaining the GFD Property.*

35.     When Green met King in 2004-2005, the two concluded that King's businesses, including KAT Enterprises, could assist Green in resurrecting Green's businesses after he received a discharge in his Chapter 7 bankruptcy case, *In re Anthony J. Green*, United States Bankruptcy Court, Northern District of Florida, Case No. 01-40532. Green received his discharge on February 2, 2002. At that time, Green was still recovering from substantial losses he sustained after being the victim of a prior fraudulent scheme.

36.     In 2014, King testified that he and Green began doing business when Green was looking for someone to provide financial backing for his business. According to King's own testimony, from 2004 to 2006, King cashed checks and made loans to Green from time to time to assist Green and Green's businesses.

### 1.     **In 2006-2007, the King Enterprise utilized TAT Enterprises to defraud the Plaintiffs.**

37.     Since the mid-1980s, Green and GFD Construction have owned 66 acres of real property on Blossom Trail in Pensacola, Florida (the "**GFD Property**"). The GFD Parcel is comprised of several separately-described parcels.

The separately-described parcels are more particularly described in **Exhibit 1** attached to this Complaint. The Plaintiffs (or some combination of them) have operated the GFD Property as a dirt and sand mine since approximately 1986.

38.     GFD Sandpit holds an industrial waste water permit (the "**GFD Sandpit Permit**") issued by the Florida Department of Environmental Protection ("**FDEP**"). The GFD Sandpit Permit permits to GFD Sandpit to dredge and mine from the GFD Property, subject any conditions and limitations of the GFD Sandpit Permit and applicable law. At all relevant times, GFD Sandpit has fulfilled all of its duties and obligations under the GFD Sandpit Permit.

39.     The State of Florida Department of Environmental Protection lists 664 industrial wastewater facilities in the State of Florida. Sixteen of those facilities are inactive. Of the remaining facilities, only 20 are issued to sand mining operators. The following table reflects the number of industrial wastewater/sand mining facilities by county in Florida:

| County | No. Facilities |
|---|---|
| Baker | 1 |
| Bay | 2 |
| Charlotte | 1 |
| Escambia | 5 |
| Gulf | 1 |
| Lake | 1 |

| County | No. Facilities |
|---|---|
| Monroe | 1 |
| Okaloosa | 1 |
| Putnam | 1 |
| Santa Rosa | 3 |
| Taylor | 1 |
| Walton | 2 |

40.     The GFD Sandpit Permit is valuable. It is one of only twelve industrial wastewater permits and one of only five dedicated to sand mining operations active in Escambia County, Florida. In fact, GFD Sandpit is one of only three sand mining operators in Escambia County, Florida. The GFD Sandpit Permit is not transferable, and no party other than GFD Sandpit is allowed to use the GFD Sandpit Permit for any purpose whatsoever.

41.     Recognizing the value of the GFD Property, King engaged in a scheme to defraud Green and GFD Construction and acquire the property for himself.

### 1.     King incorporated TAT Enterprises to be a joint venture among King, Bettis, and Green.

42.     On or about September 8, 2006, King incorporated TAT Enterprises by filing with the Florida Secretary opf State those certain Articles of Incorporation (the "**TAT Articles**") dated as of September 6, 2006. True and correct copies of the TAT Articles are attached to this Complaint as **Exhibit 2**.

43.     According to the TAT Articles, King was the initial President and Director of TAT Enterprises. **Ex. 2**. According to the TAT Articles, Green was the initial Secretary of the TAT Enterprises. *Id*. Green also was one of two Vice Presidents of TAT Enterprises. *Id*.

44.     On or about September 15, 2006, King transmitted to the Internal Revenue Service a Form SS-4 Application for Employer Identification Number on

14

behalf of TAT Enterprises. A true and correct copy of the September 15, 2006,

Form SS-4 is attached to this Complaint as **Exhibit 3**.

45.     On or about September 22, 2006, the Internal Revenue Service issued

an employer identification number ending in 6545 to TAT Enterprises. A true and

correct copy of the September 22, 2006, EIN Letter is attached to this Complaint as

**Exhibit 4**.

46.     On April 13, 2007, King filed with the Florida Secretary of State the

2007 For Profit Corporation Annual Report of TAT Enterprises. A true and correct

copy of the April 13, 2007 Annual Report is attached to this Complaint as

**Exhibit 5**.

47.     According to the 2007 For Profit Corporation Annual Report of TAT

Enterprises, King was the President and Director of TAT Enterprises, and Green

was the Secretary of TAT Enterprises. **Ex. 5**. Green also was one of two Vice

Presidents of TAT Enterprises. *Id*.

48.     King signed the 2007 For Profit Corporation Annual Report of TAT

Enterprises as the President and Director of TAT Enterprises. *Id*.

49.     When King signed the 2007 For Profit Corporation Annual Report of

TAT Enterprises, he made the following certification:

> I hereby certify that the information supplied with this filing does not
> qualify for the for the exemption stated in Chapter 119, Florida
> Statutes. I further certify that the information indicated on this report
> or supplemental report is true and accurate and that my electronic

signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

*Id*.

### 2.     King surreptitiously divested Green of his interests in TAT Enterprises.

50.     On April 17, 2007, just four days after he filed TAT Enterprises' 2007 For Profit Corporation Annual Report, King filed with the Florida Secretary of State the 2007 For Profit Corporation **Amended** Annual Report of TAT Enterprises. A true and correct copy of the April 17, 2007, Amended Annual Report is attached to this Complaint as **Exhibit 6**. In TAT Enterprises' 2007 Amended Annual Report, King removed Green as the Secretary and Vice President of TAT Enterprises. **Ex. 6**. King identified himself as the President and Secretary of TAT Enterprises, and he appointed Bettis as the Treasurer and Vice President of TAT Enterprises. *Id*.

51.     King signed the 2007 Amended Annual Report of TAT Enterprises as the President and Secretary of TAT Enterprises. *Id*.

52.     When King signed the 2007 Amended Annual Report of TAT Enterprises, he made the following certification:

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report

16

or supplemental report is true and accurate and that my electronic
signature shall have the same legal effect as if made under oath; that I
am an officer or director of the corporation or the receiver or trustee
empowered to execute this report as required by Chapter 607, Florida
Statutes; and that my name appears above, or on an attachment with
an address, with all other like empowered.

*Id*.

53.     On or about September 6, 2007, King purported to resign as an officer

or owner of TAT Enterprises. That day, King drafted a letter on TAT Enterprises'

letterhead in which he wrote:

As of September 6, 2007 Thomas D. King is no longer an Officer or
Owner of TAT Enterprises, Inc. and will no longer be responsible for
payment personally or corporately. Remove Thomas D. King from
any & all Credit Applications associated with TAT Enterprises Inc.
Please have corporate officer acknowledge and sign this facsimile and
fax back to my attention at (850)439-0656. The new ownership of
TAT Enterprises Inc will be contacting you in regards to new contact
information & billing information. If you have any questions please
feel free to contact me at (850)393-4726. Thanks for your cooperation
in this matter. Any questions concerning unpaid invoices please
contact Teresa Robarts, A/P, at (850)435-4832 or Anthony Bettis, New
Owner, at (850)554-8892.[4]

A true and correct copy of King's September 6, 2007, resignation is attached to this

Complaint as **Exhibit 7**.

---

[4] At that time, Teresa Robarts worked for King, and King's phone number was
(850)435-4832.

54.     On September 11, 2007, Bettis filed an second amended Annual Report for TAT Enterprises. A true and correct copy of TAT Enterprises' September 11, 2007, Amended Annual Report is attached to this Complaint as **Exhibit 8**.

55.     In TAT Enterprises' September 11, 2007, amended annual report, Bettis changed TAT Enterprises' registered agent from King to himself. **Ex. 8**. Bettis also identified himself as President and Secretary of TAT Enterprises. *Id*.

56.     On August 27, 2009, Bettis filed that certain For Profit Corporation Reinstatement for TAT Enterprises. A true and correct copy of the August 27, 2009 Reinstatement is attached to this Complaint as **Exhibit 9**. Bettis signed the 2009 For Profit Corporation Reinstatement as President and Secretary of TAT Enterprises. **Ex. 9**. On July 1, 2010, Bettis filed TAT Enterprises' 2010 For Profit Corporation Annual Report. A true and correct copy of TAT Enterprises' July 1, 2010, Annual Report is attached to this Complaint as **Exhibit 10**. Bettis signed the 2010 For Profit Corporation Annual Report as President and Secretary of TAT Enterprises. **Ex. 10**. TAT Enterprises has not filed any annual reports with the Florida Secretary of State since July 1, 2010. It has been administratively dissolved since September 23, 2011.

3.    **The King Enterprise fraudulently induced Green and GFD Construction into pledging their property in exchange for equity in TAT Enterprises.**

57.    In 2006, King, Bettis, and Green agreed to form a company that would utilize Green's and Bettis' construction contacts, property, and expertise to perform various construction activities in northwest Florida. King agreed that he would capitalize his interest in the company with cash. Green and Bettis agreed that they would fund their contributions to the company with the proceeds from existing and future contracts.

58.    In connection with their efforts to capitalize the to-be-formed company, Green and GFD Construction pledged some of their heavy equipment, including dump trucks and similar equipment, as security for advances King, KAT Enterprises, and West Florida made from time to time to Green and GFD Construction to fund their operations until formation of the entity.

59.    To fund Green's capital contribution to TAT Enterprises and to recoup some of the money he purportedly advanced to or on behalf of Green and/or GFD Construction, King induced Green to execute a series of agreements ultimately intended for King's sole and exclusive benefit.

60.    In early 2007, King represented to Green that Green's equity in TAT Enterprises would be represented by promissory notes and other non-cash contributions, such as the mineable sand and dirt available on the GFD Property.

19

61.     On or about April 19, 2007, Green executed that certain Promissory Note dated as of April 19, 2007, by Green in favor of King in the original principal amount of $65,000.00 ("**Note No. 1**"). A true and correct copy of Note No. 1 is attached to this Complaint as **Exhibit 11**. Note No. 1 provided that the principal balance would bear interest at ten percent (10%) annually. *Id*. Note No. 1 provided also that the entire principal balance and any accrued interest were payable in one balloon payment on or before October 15, 2008. *Id*.

62.     Note No. 1 provided as follows:

> This note with interest is secured by a purchase money mortgage, of even date herewith, the terms of which are incorporated herein by reference, made by the makers hereof in favor of the said payee, is given as part of the purchase price of the real property described in the mortgage, and shall be construed and enforced according to the laws of the State of Florida.

*Id*.

63.     Green also executed that certain Mortgage by Green in favor of King dated as of April 19, 2007, and recorded in Official Records Book 6129, Page 212, of the Public Records of Escambia County, Florida ("**Mortgage No. 1**"). A true and correct copy of Mortgage No. 1 is attached to this Complaint as **Exhibit 12**. In Mortgage No. 1, Green purported to pledge Parcel 3 and Parcel 6 as collateral for Note No. 1. *Id*. at 1, 4.

64.     Then, on or about April 19, 2007, Green executed that certain Promissory Note dated as of April 19, 2007, by GFD Construction in favor of King

in the original principal amount of $70,000.00 ("**Note No. 2**"). A true and correct copy of Note No. 2 is attached to this Complaint as **Exhibit 13**. Green signed Note No. 2 in his capacity as the President of GFD Construction. **Ex. 13**. Note No. 2's terms and conditions were identical to Note No. 1's terms and conditions.

65.     Green also executed that certain Mortgage by GFD Construction in favor of King dated as of April 19, 2007, and recorded in Official Records Book 6129, Page 217, of the Public Records of Escambia County, Florida ("**Mortgage No. 2**"). A true and correct copy of Mortgage No. 2 is attached to this Complaint as **Exhibit 14**. Green executed Mortgage No. 2 in his capacity as the President of GFD Construction. **Ex. 14**. In Mortgage No. 2, GFD Construction purported to pledge Parcel 5 as collateral for Note No. 2. *Id*. at 1, 4.

66.     That same day, Green executed that certain Promissory Note dated as of April 19, 2007, by Green's Fill Dirt, Inc., a dissolved Florida corporation ("**Green's Fill Dirt**"), in favor of King in the original principal amount of $70,000.00 (the "**Note No. 3**"). A true and correct copy of Note No. 3 is attached to this Complaint as **Exhibit 15**. Green signed Note No. 3 in his capacity as the President of Green's Fill Dirt. **Ex. 15**. Note No. 3's terms and conditions were identical to Note No. 1's terms and conditions. *Id*.

67.     Green also executed that certain Mortgage by Green's Fill Dirt in favor of King dated as of April 19, 2007, and recorded in Official Records Book

6129, Page 222, of the Public Records of Escambia County, Florida ("**Mortgage No. 3**").[5] A true and correct copy of Mortgage No. 3 is attached to this Complaint as **Exhibit 16**. Green executed Mortgage No. 3 in his capacity as the President of Green's Fill Dirt. **Ex. 16**. In Mortgage No. 3, Green's Fill Dirt purported to pledge Parcel 1 and Parcel 4 as collateral for Note No. 3. *Id*. at 1, 4.

68.     Despite the language of Note No. 1, Note No. 2, and Note No. 3, none of the mortgages were "purchase money mortgages." None of the promissory notes evidenced debt incurred for the purchase of the GFD Property. None of the mortgages secured payment of the purchase price for any part of the GFD Property.

> **4.     The King Enterprise also fraudulently induced Green, GFD Construction, and Green's Fill Dirt into leasing the GFD Property to TAT Enterprises in exchange for equity in TAT Enterprises.**

69.     On or about April 19, 2007, Green, GFD Construction, and Green's Fill Dirt, as Lessors, and TAT Enterprises, as Lessee, entered into that certain Sand Pit Lease (the "**Sand Pit Lease**"), pursuant to which Green, GFD Construction, and Green's Fill Dirt granted to TAT Enterprises the right to mine sand from the Property. A true and correct copy of the Sand Pit Lease is attached to this Complaint as **Exhibit 17**.

---

[5] Collectively, Note No. 1, Mortgage No. 1, Note No. 2, Mortgage No. 2, Note No. 3, and Mortgage No. 3 will be referred to in this Complaint as the "**GFD Mortgage Instruments**."

70.     Green signed the Sand Pit Lease individually, in his capacity as President of GFD Construction, and as President of Green's Fill Dirt. **Ex. 17**.

71.     Even though King was, at that time, the President, sole shareholder, and sole director of TAT Enterprises, King instructed Bettis to sign the Sand Pit Lease in his capacity as Vice President of TAT Enterprises. *Id*.

72.     The Sand Pit Lease recited that TAT Enterprises agreed to pay Green, GFD Construction, and Green's Fill Dirt the sum of Ten and No/100 Dollars ($10.00) as consideration for the right to mine sand from the Property. *Id*. The Sand Pit Lease provided that its term would expire on October 15, 2008, the same day the Promissory Notes matured. *Id*.

    **5.     The King Enterprise devised an equipment leasing scheme to defraud the Green, GFD Construction, and Green's Fill Dirt.**

73.     April 2007 and May 2007, TAT Enterprises and West Florida entered into three equipment leases (the "**Equipment Leases**"), pursuant to which TAT Enterprises agreed to lease from West Florida certain heavy duty trucks and equipment for use in TAT Enterprises' business.

    **a.     Lease No. 1**

74.     On April 15, 2007, West Florida, as Lessor, and TAT Enterprises, as Lessee, entered into that certain Equipment Lease dated as of April 15, 2007 ("**Lease No. 1**"), pursuant to which West Florida agreed to lease to TAT

Enterprises, and TAT Enterprises agreed to lease from West Florida, the following vehicles:

| Year, Make, and Model | Serial No. or VIN |
|---|---|
| 2006 Peterbilt Model 378 | 1NPFLBTX46N637340 |
| 2006 Peterbilt Model 378 | 1NPFLBTX76N637333 |
| 2006 Peterbilt Model 335 | 2NPLLZ0X86M668011 |

A true and correct copy of Lease No. 1 is attached to this Complaint as **Exhibit 18**.

75.    The term of Lease No. 1 commenced on April 15, 2007, and continued for 48 months. *Id.*, para. 4 at 2.

76.    Lease No. 1 obligated TAT Enterprises to pay rent monthly to West Florida in the amount of $8,896.00, plus sales tax in the amount of $608.76, for a total monthly payment of $9,504.76, during the entire term of Lease No. 1. *Id.*, paras. 4-5 at 2.

77.    According to Lease No. 1, TAT Enterprises pledged its own vehicles as security for its obligations under Lease No. 1, as follows: "[Lessee] also agrees to pledge 2 Volvo trucks (listed below) for collateral in lieu of a larger cash down payment and agrees to forfeit ownership of these two trucks should they default on the terms of the lease." *Id*.

78.    Lease No. 1 listed the following trucks as collateral for TAT Enterprises' obligations under Lease No. 1:

24

| Year, Make, and Model | Serial No. or VIN |
|---|---|
| 1999 Volvo Truck | 4VHJCCBE6XN865951 |
| 1999 Volvo Truck | 4VHJCCBE8XN865952 |

*Id*.

79.     King signed Lease No. 1 as the President of West Florida. *Id*. at 7.

80.     Even though King was, at that time, the President, sole shareholder, and sole director of TAT Enterprises, King instructed Bettis to sign Lease No. 1 in his capacity as Vice President of TAT Enterprises. *Id*. at 7.

**b.     Lease No. 2**

81.     On May 4, 2007, West Florida, as Lessor, and TAT Enterprises, as Lessee, entered into that certain Equipment Lease dated as of May 4, 2007 ("**Lease No. 2**"), pursuant to which West Florida agreed to lease to TAT Enterprises, and TAT Enterprises agreed to lease from West Florida, that certain 2006 48' Volvo Model EC240BLC Excavator bearing Serial No. 0210. A true and correct copy of Lease No. 2 is attached to this Complaint as **Exhibit 19**.

82.     The term of Lease No. 2 commenced on March 16, 2007, and continued for 48 months. *Id*., para. 4 at 2.

83.     Lease No. 2 obligated TAT Enterprises to pay rent monthly to West Florida in the amount of $4,427.56, plus sales tax in the amount of $332.06, for a total monthly payment of $4,759.62, during the entire term of Lease No. 2. *Id*., para. 5 at 2.

84.    King signed Lease No. 2 as the President of West Florida.

85.    King instructed Bettis and Green both to sign the Sand Pit Lease in their capacities as Vice Presidents of TAT Enterprises. *Id*. at 7.

86.    At that time, King was the President, sole shareholder, and sole director of TAT Enterprises.

87.    At the time Green signed Lease No. 2, Green had no authority to sign for or bind TAT Enterprises because, on April 17, 2007, King had removed Green as the Secretary and Vice President of TAT Enterprises.

88.    At the time Green signed Lease No. 2, Green had no authority to sign for or bind TAT Enterprises because, on April 17, 2007, King had removed Green as the Secretary and Vice President of TAT Enterprises.

89.    At the time Green signed Lease No. 3, Green had no knowledge that, on April 17, 2007, King had removed Green as the Secretary and Vice President of TAT Enterprises.

### c.    Lease No. 3

90.    On May 4, 2007, West Florida, as Lessor, and TAT Enterprises, as Lessee, entered into that certain Equipment Lease dated as of May 4, 2007 ("**Lease No. 3**"), pursuant to which West Florida agreed to lease to TAT Enterprises, and TAT Enterprises agreed to lease from West Florida, that certain Daewoo M250V

Wheel Loader bearing Serial No. V4067. A true and correct copy of Lease No. 3 is attached to this Complaint as **Exhibit 20**.

91.     The term of Lease No. 3 commenced on March 16, 2007, and continued for 36 months. *Id*., para. 4 at 2.

92.     Lease No. 3 obligated TAT Enterprises to pay rent monthly to West Florida in the amount of $2,636.17, plus sales tax in the amount of $197.71, for a total monthly payment of $2,833.88, during the entire term of Lease No. 3. *Id*., paras. 4-5 at 2.

93.     King signed Lease No. 2 as the President of West Florida, and Bettis signed Lease No. 2 as the Vice President of TAT Enterprises. *Id*. at 7.

94.     Green also signed Lease No. 2 as the Vice President of TAT Enterprises. *Id*. at 7.

95.     At the time Green signed Lease No. 3, Green had no authority to sign for or bind TAT Enterprises because, on April 17, 2007, King had removed Green as the Secretary and Vice President of TAT Enterprises.

96.     At the time Green signed Lease No. 3, Green had no knowledge that, on April 17, 2007, King had removed Green as the Secretary and Vice President of TAT Enterprises.

97.     In consideration of King's representations and what Green understood to be his equity interest in TAT Enterprises, as of May 4, 2007, Green, in his

various capacities, had executed the documents and incurred financial obligations

in excess of $500,000.00 (collectively, the "**TAT Obligations**"), as follows:

| Date | Document | Financial Obligation |
|------|----------|----------------------|
| 04/19/07 | Note No. 1 | $65,000.00 |
| 04/19/07 | Note No. 2 | $70,000.00 |
| 04/19/07 | Note No. 3 | $70,000.00 |
| 05/04/07 | Lease No. 2 | $228,461.76 |
| 05/04/07 | Lease No. 3 | $102,019.68 |
| **Total** | | **$535,481.44** |

98.     Green entered into or otherwise incurred the TAT Obligations **just two**

**days after** King filed the 2007 Amended Annual Report removing Green as Vice

President and Secretary of TAT Enterprises. Had King notified Green that King had

removed Green from any authority or ownership in TAT Enterprises, Green never

would never have signed any of the GFD Mortgage Instruments, the Sand Pit

Lease, or the Equipment Leases.

99.     At the time Green signed the TAT Obligations, he had no knowledge

that he was not an officer or shareholder of TAT Enterprises because King

intentionally concealed from Green that King had divested Green any interests at

all in KAT Enterprises. If King had informed Green that King had filed the 2007

Amended Annual Report , Green would not have executed any of the TAT

Obligations in any capacity.

100.   Thus, Green encumbered, obligated, and contributed the GFD Property as his equity in TAT Enterprises, but King had already removed Green from any management or control of the very company Green was capitalizing.

### 6.   King and West Florida filed suit to enforce the fraudulent Equipment Leases.

101.   Overall, the Equipment Leases provided for potential future cash flows of $786,709.92 for King, as shown in the following table:

| Equipment Lease | Term (months) | Monthly Rent | Sales Tax | Total Monthly Payment | Total Rent Payable |
|---|---|---|---|---|---|
| Lease No. 1 | 48 | $8,896.00 | $608.76 | $9,504.76 | $456,228.48 |
| Lease No. 2 | 48 | $4,427.56 | $332.06 | $4,759.62 | $228,461.76 |
| Lease No. 3 | 36 | $2,636.17 | $197.71 | $2,833.88 | $102,019.68 |
| **Totals** | | **$15,959.73** | **$1,138.53** | **$17,098.26** | **$786,709.92** |

102.   The potential future cash flows associated with the Equipment Leases were well in excess of the value of the equipment West Florida leased to TAT Enterprises.

103.   According to King's sworn testimony in 2010, King viewed the potential cash flows from the Equipment Leases as a loan to TAT Enterprises secured by the equity interests in TAT Enterprises, which he alone owned.

104.   On October 2, 2009, King caused West Florida to file that certain civil action styled *West Florida Auto Exchange, Inc. v. TAT Enterprises, Inc.*, Circuit Court of Escambia County, Florida, Case No. 2009-CA-003392 (the "**Lease Case**").

105.   In the Lease Case, West Florida alleged that TAT Enterprises breached the Equipment Leases on the dates and in the amounts shown in the following table:

| Equipment Lease | Date of Breach | Damages Claimed |
|---|---|---|
| Lease No. 1 | 11/15/07 | $342,171.36 |
| Lease No. 2 | 09/15/07 | $190,384.80 |
| Lease No. 3 | 09/15/07 | $85,016.40 |
| **Total** | | **$617,572.56** |

106.   On November 12, 2009, West Florida moved for a default judgment, and on November 16, 2009, West Florida obtained a clerk's default. On February 9, 2010, West Florida moved a final judgment. On February 15, 2010, West Florida obtained a Final Judgment against TAT Enterprises in the amount of $722,648.34, consisting of $576,443.50 in principal under the Equipment Leases, prejudgment interest of $145,769.84, and costs of $435.00.

107.   In the Lease Case, West Florida alleged that TAT Enterprises breached Lease No. 2 and Lease No. 3 on September 15, 2007. Based on those allegations, TAT Enterprises breached Lease No. 2 and Lease No. 3 just nine days after King resigned and conveyed his interests in TAT Enterprises to Bettis.

108.   Importantly, TAT Enterprises made no effort to defend the Lease Case because, on information and belief, King, West Florida, Bettis, and TAT Enterprises conspired and agreed that TAT Enterprises would not defend the Lease Case, thereby enabling West Florida to obtain a judgment against TAT Enterprises

for purposes of defrauding the Plaintiffs and others. At that time, TAT Enterprises continued to operate out of the property occupied by KAT Enterprises and West Florida on Pace Boulevard in Pensacola, Florida, and Bettis depended on King to keep TAT Enterprises operating.

### 7. The Mortgage Foreclosure Case

109. When the promissory notes matured on October 15, 2008, King wasted no time filing suit.

110. On October 23, 2008, just eight days after the promissory notes matured, King filed that certain civil action styled *Thomas D. King v. GFD Construction, Inc.*, Circuit Court of Escambia County, Florida, Case No. 2008-CA-003385, seeking to enforce and foreclose Mortgage No. 2 encumbering Parcel 5.

111. Five days later, on October 28, 2008, King filed that certain civil action styled *Thomas D. King v. Green's Fill Dirt, Inc.*, Circuit Court of Escambia County, Florida, Case No. 2008-CA-003427, seeking to enforce and foreclose Mortgage No. 3 encumbering Parcels 1 and 4.

112. On June 7, 2011, King filed that certain civil action styled *Thomas D. King v. Anthony J. Green*, Circuit Court of Escambia County, Florida, Case No. 2011-CA-000972, seeking to enforce and foreclose Mortgage No. 1 encumbering Parcel 3 and Parcel 6.

113.   On May 16, 2011, the Circuit Court of Escambia County, Florida, consolidated Case No. 2008-CA-003385 and Case No. 2008-CA-3427, and both cases progressed under Case No. 2008-CA-3385.

114.   Then, on October 19, 2011, the Circuit Court of Escambia County, Florida, consolidated Case No. 2008-CA-003385 and Case No. 2011-CA-000972, and all of King's foreclosure cases progressed under Case No. 2008-CA-3385 (the "**State Court Foreclosure Case**").

115.   On or about May 15, 2012, the state court entered that certain Final Judgment of Foreclosure (the "**2012 Foreclosure Judgment**") against GFD Construction and in favor of King in the amount of $210,009.04. A true and correct copy of the 2012 Foreclosure Judgment is attached to this Complaint as **Exhibit 21**. The state court also ordered a sale of the property described in Mortgage No. 1 and Mortgage No. 3. *Id*.

116.   On June 12, 2012, the Clerk of Courts of Escambia County, Florida, sold Parcels 1, 3, 4, and 6. True and correct copies of the Certificates of Sale are attached to this Complaint as **Exhibit 22**. King was the successful bidder at the June 12, 2012, sale. *Id*.

117. Thus, on June 12, 2012, Mortgage No. 1 and Mortgage No. 3 merged into the 2012 Foreclosure Judgment.[6]

118. On June 18, 2012, King filed two Assignments of Final Judgment of Foreclosure and Foreclosure Sale Bid dated as of June 14, 2012, in favor of KTTTC Investments (the "**KTTTC Assignments**"). True and correct copies of the KTTTC Assignments are attached to this Complaint as **Exhibit 23**.

119. In the first KTTTC Assignment, King assigned Note No. 3, Mortgage No. 3, the 2012 Foreclosure Judgment, and his Foreclosure Sale Bid to KTTTC Investments, as follows:

> The undersigned, THOMAS D. KING,, the Plaintiff in the above-styled cause and successful bidder at the sale held June 12, 2012, for valuable consideration does hereby assign and transfer the Final Judgment of Foreclosure and Foreclosure Sale Bid in the above-referenced action and the indebtedness secured thereby as well as the Note and Mortgage in the original amount of $70,000.00 to KTTTC Investments, Inc. Assignor does hereby direct that the Certificate of Title, when issued, be issued to KTTTC Investments, Inc.

**Ex. 23** (underline in original).

---

[6] "It is indisputable that a mortgage merges with a final judgment of foreclosure and is extinguished by the sale of the underlying property." *Aventura Mgmt., LLC v. Spiaggia Ocean Condo. Ass'n, Inc.*, 105 So. 3d 637, 639 (Fla. Dist. Ct. App. 2013) (*citing One 79th St. Estates, Inc. v. Am. Inv. Servs.*, 47 So. 3d 886, 889 (Fla. Dist. Ct. App. 2010) ("When a mortgage is foreclosed, the mortgage is 'merged' into the final judgment and loses its separate identity."); *Nack Holdings, LLC v. Kalb*, 13 So. 3d 92, 94 n. 2 (Fla. Dist. Ct. App. 2009) ("The mortgage is merged into the judgment, is thereby extinguished, and 'loses its identity.'").

120. In the second KTTTC Assignment, King assigned Note No. 1, Mortgage No. 1, the 2012 Foreclosure Judgment, and his Foreclosure Sale Bid to KTTTC Investments, as follows:

> The undersigned, THOMAS D. KING,, the Plaintiff in the above-styled cause and successful bidder at the sale held June 12, 2012, for valuable consideration does hereby assign and transfer the Final Judgment of Foreclosure and Foreclosure Sale Bid in the above-referenced action and the indebtedness secured thereby as well as the Note and Mortgage in the original amount of $65,000.00 to KTTTC Investments, Inc. Assignor does hereby direct that the Certificate of Title, when issued, be issued to KTTTC Investments, Inc.

*Id.*

121. On June 14, 2012, King's interests in the Final Judgment of Foreclosure vested completely in KTTTC Investments.

122. On July 13, 2012, the Clerk of Courts of Escambia County, Florida, issued to KTTTC Investments two Certificates of Title dated as of July 13, 2012, and recorded in Official Records Book 6882, Page 1226, and Official Records Book 6882, Page 1228, of the Public Records of Escambia County, Florida.

123. One month later, on August 13, 2012, Mr. Bednar filed his notice of appearance in the State Court Foreclosure Case.

124. On August 23, 2012, **after the sale** of Parcels 1, 3, 4, and 6, King filed a Motion to Amend Complaint, alleging that King and GFD Construction unintentionally omitted Parcel 5 from the legal descriptions attached to the GFD Mortgage.

34

125.   On December 30, 2015, the Circuit Court of Escambia County, Florida, entered that certain Final Judgment of Reformation and Foreclosure pursuant to which the court reformed Mortgage No. 1 to include the Sand Pit Parcel as collateral for Note No. 3. The court also scheduled a sale of the Sand Pit Property for January 6, 2016. A true and correct copy of the Final Judgment of Reformation is attached to this Complaint as **Exhibit 24**.

### 8.   GFD's Bankruptcy Cases

126.   As the King Enterprise moved closer to its goal of divesting the Plaintiffs of their property, on February 1, 2016, GFD Construction filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in that case styled *In re GFD Construction, Inc.*, United States District Court, Northern District of Florida, Case No. 16-60087 ("***GFD I***").

127.   On March 17, 2016, King filed a Proof of Claim related to his claims against GFD Construction. A true and correct of King's March 17, 2016, Proof of Claim is attached to this Complaint as **Exhibit 25**.

128.   In his March 17, 2016, Proof of Claim, King asserted that the value of the GFD Property was $500,000.00. **Ex. 25** at 2.

129.   King asserted also that the amount of his claim against GFD Construction was $424,727.68. *Id*.

130.   Mr. Bednar signed King's March 17, 2016, as King's attorney or authorized agent. *Id*. at 3.

131.   In King's March 17, 2016, Proof of Claim, Mr. Bednar declared as follows: "I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct." *Id*.

132.   Mr. Bednar's declaration that the GFD Property was worth $500,000.00 as of March 17, 2016, was false, and Mr. Bednar knew or should have known that his declaration was false. Mr. Bednar possessed no reasonable basis for making such a declaration.

133.   As of March 17, 2016, the GFD Property was worth only a fraction of $500,000.00. The Escambia County, Florida, Property Appraiser appraised the GFD Property for tax purposes at $27,450.00, and the GFD Property for years has been classified as "waste land" by Escambia County, Florida.

134.   During *GFD I*, King actively interfered with GFD Construction's efforts to reorganize under Chapter 11 of the Bankruptcy Code. On information and belief, King instructed one of his employees to contact GFD Construction's property and casualty insurance agent, Mr. Sean Kramer. Posing as the owner of the Sand Pit Property, King's employee instructed Mr. Kramer to cancel all existing

policies issued for GFD Construction. She also instructed Mr. Kramer that nobody was authorized to obtain insurance for the Sand Pit Property.

135.    Also during *GFD I*, on May 2, 2016, Mr. Kidd, one of King's co-conspirators, filed that certain civil action styled *Barry D. Kidd v. Anthony J. Green, Sr.*, Circuit Court of Escambia County, Florida, Case No. 2016 DR 001762, in which Mr. Kidd made numerous demonstrably false accusations against Green, in an effort to derail GFD Construction's efforts at reorganization.

136.    Ultimately, GFD Construction was not able to confirm a plan of reorganization under the Bankruptcy Code. On December 9, 2016, the Bankruptcy Court dismissed *GFD I*, as agreed between GFD Construction and the United States Trustee.

137.    On February 1, 2017, GFD Construction filed its second case under the Bankruptcy Code in that case styled *In re GFD Construction, Inc.*, United States Bankruptcy Court Northern District of Florida, Case No. 17-30084 ("***GFD II***").

138.    During GFD II, Mr. Kidd parked his vehicle just outside of the Sand Pit Property in an effort to interfere with GFD Construction's business. On information and belief, after being confronted about his presence at the property, Mr. Kidd left the Sand Pit Property and drove to Pensacola Specialty Pawn, where he met with King.

139.   On June 8, 2017, King filed a Proof of Claim related to his claims against GFD Construction. A true and correct copy of King's June 8, 2017, Proof of Claim is attached to this Complaint as **Exhibit 26**.

140.   In his June 8, 2017, Proof of Claim, King asserted that the value of the GFD Property was $500,000.00. **Ex. 26** at 2.

141.   King asserted also that the amount of his claim against GFD Construction was $444,881.73. *Id*.

142.   Mr. Bednar signed King's June 8, 2017, as King's attorney or authorized agent. *Id*. at 3.

143.   In King's June 8, 2017, Proof of Claim, Mr. Bednar declared as follows: "I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct." *Id*.

144.   As of June 8, 2017, the Escambia County, Florida, Property Appraiser appraised the GFD Property for tax purposes at $27,450.00, and the GFD Property for years had been classified as "waste land" by Escambia County, Florida.

145.   Mr. Bednar's declaration that the GFD Property was worth $500,000.00 as of June 8, 2017, was false, and Mr. Bednar knew or should have known that his declaration was false. Mr. Bednar possessed no reasonable basis for declaring that the GFD Property was worth $500,000.00.

38

146.    On or about January 23, 2018, GFD Construction dismissed *GFD II*.

147.    In another effort to save the GFD Property, which GFD Construction had owned since 1996, on April 2, 2018, GFD filed another petition for relief under the Bankruptcy Code in that certain case styled *In re GFD Construction, Inc.*, United States District Court, Northern District of Florida, Case No. 18-30317 ("**GFD III**").

148.    During *GFD III*, King endeavored to manipulate by the bankruptcy court by intentionally misrepresenting the value of the Sand Pit Property.

149.    On May 1, 2018, King filed a Proof of Claim related to his claims against GFD Construction. A true and correct of King's May 1, 2018, Proof of Claim is attached to this Complaint as **Exhibit 27**.

150.    In his May 1, 2018, Proof of Claim, King once again asserted that the value of the GFD Property was $500,000.00. **Ex. 27** at 2.

151.    King asserted also that the amount of his claim against GFD Construction was $469,890.25. *Id*.

152.    Mr. Bednar signed King's May 1, 2018, Proof of Claim as King's attorney or authorized agent. *Id*. at 3.

153.    In King's May 1, 2018, Proof of Claim, Mr. Bednar declared as follows: "I have examined the information in this Proof of Claim and have a

reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct." *Id*.

154.   As of May 1, 2018, the Escambia County, Florida, Property Appraiser appraised the GFD Property for tax purposes at $27,450.00, and the GFD Property for years had been classified as "waste land" by Escambia County, Florida.

155.   Mr. Bednar's declaration that the GFD Property was worth $500,000.00 as of June 8, 2017, was false, and Mr. Bednar knew or should have known that his declaration was false. Mr. Bednar possessed no reasonable basis for declaring that the GFD Property was worth $500,000.00.

156.   Also during *GFD III*, King and his employees made efforts to interfere with GFD Construction's efforts to reorganize. In an effort to drive business away from GFD Construction, King's employees would surveil the Sand Pit Property. They also would follow GFD Construction's customers as they left the Sand Pit Property. In some instances, King's employees would hail GFD Construction's customers and instruct them not to do business with the Plaintiffs.

157.   On or about March 28, 2019, the bankruptcy court dismissed *GFD III*.

**9.    Upon dismissal of *GFD III*, King pounced again to achieve his fraudulent objectives.**

158.   Immediately after the dismissal of *GFD III*, on March 28, 2019, King filed in the State Court Foreclosure Case a motion to reschedule the foreclosure

sale of the GFD Property. On or about April 4, 2019, the state court ordered that the Sand Pit Property be sold at auction on May 3, 2019.

159.   On May 3, 2019, the Clerk of Court of Escambia County, Florida, sold the Sand Pit Property for $100.00 to King. On or about May 10, 2019, King executed that certain Assignment of Final Judgment of Reformation and Foreclosure, Final Judgment Determining Plaintiff's Attorney's Fees and Costs and Foreclosure Sale Bid in favor of Terra Gulf Coast.[7] True and correct copies of the May 10, 2019, Assignment is attached to this Complaint as **Exhibit 28**.

160.   On May 14, 2019, the Clerk of courts of Escambia County, Florida, issued to Terra Gulf Coast that certain Certificate of Title dated as of May 14, 2019, and recorded in Official Records Book 8094, Page 1020, of the Public Records of Escambia County, Florida. A true and correct copy of the May 14, 2019, Certificate of Title is attached to this Complaint as **Exhibit 29**.

161.   On May 17, 2019, King and Terra Gulf Coast sought and obtained a Writ of Possession for the Sand Pit Property ordering the Escambia County, Florida, Sheriff's Department to remove all persons from the Sand Pit Property. A true and correct copy of the May 17, 2019, Writ of Possession is attached to this Complaint as **Exhibit 30**.

---

[7] King is the sole member of Terra Gulf Coast.

162.   On May 20, 2019, at approximately 10:00 a.m. CDT, King arrived at the Sand Pit Property with numerous deputies from the Escambia County, Florida, Sheriff's Department to forcibly evict the Plaintiffs from the Sand Pit Property.

163.   Since that time, King and his employees, agents, and other co-conspirators have forced their ways into GFD Construction's office trailer. They have taken possession of GFD Sandpit's personal property, including heavy equipment such a loaders and excavators.

164.   They have attempted to operate GFD Sandpit's equipment, including barges, dredges, generators, pumps, motors, conveyor belts, power screens, augurs, and sand wash plant. Any improper operation of such equipment likely will destroy the equipment. The sand wash plant was custom-built by Green himself and is not susceptible to ready valuation.

165.   Since taking possession of the Sand Pit Property, King has even asked Gregory Green whether he would be willing to operate the Sand Pit Property for the King Enterprise.

166.   Thus, upon the sale of the Sand Pit Property to Terra Gulf Coast and the eviction of the Plaintiffs from the Sand Pit Property, King achieved the ultimate end of his fraudulent efforts against the Plaintiffs, finally acquiring title to the Sand Pit Property for himself.

**A.**     *King controls the Defendant entities.*

    **1.**     **KAT Enterprises**

167.   King incorporated KAT Enterprises on or about June 20, 2000, by filing with the Florida Secretary of State those certain Articles of Incorporation of KAT Enterprises of Pensacola, Inc. (the "**KAT Articles**") dated as of June 19, 2000. True and correct copies of the KAT Articles are attached to this Complaint as **Exhibit 31**. The KAT Articles identified King as the initial director, President, and Secretary of KAT Enterprises. **Ex. 31**.

168.   On or about March 13, 2012, King filed with the Florida Secretary of State those certain Articles of Amendment to Articles of Incorporation of KAT Enterprises of Pensacola, Inc., dated as of March 9, 2012. True and correct copies of the March 9, 2012, Articles of Amendment are attached to this Complaint as **Exhibit 32**. In the March 9, 2012, Articles of Amendment, King added as officers Chance D. King and Judy K. Merritt, both of whom King appointed as Vice Presidents of KAT Enterprises. **Ex. 32**.

169.   On or about December 11, 2014, King filed with the Florida Secretary of State those certain Articles of Amendment to Articles of Incorporation of KAT Enterprises of Pensacola, Inc., dated as of December 8, 2014. True and correct copies of the December 8, 2014, Articles of Amendment are attached to this

Complaint as **Exhibit 33**. In the December 8, 2014, Articles of Amendment, King removed Chance D. King as a Vice President of KAT Enterprises. **Ex. 33**.

170.   At all times since the incorporation of KAT Enterprises, King has been the President and the sole Director of KAT Enterprises.

171.   KAT Enterprises, d/b/a Pensacola Specialty Pawn, is licensed as a pawnbroker in the State of Florida, as follows:

a.    On or about August 15, 2001, the Florida Department of Agriculture issued pawnbroker license number PN2035 in the name of Pensacola Specialty Pawn. Pawnbroker license number PN2035 expired on December 11, 2016.

b.    On or about May 13, 2014, the Florida Department of Agriculture issued pawnbroker license number PN3906 in the name of Pensacola Specialty Pawn. Pawnbroker license number PN3906 is active and registered according to the records of the Florida Department of Agriculture. Pawnbroker license number PN3906 applies to KAT Enterprises' business location at 6428 Pensacola Boulevard, Pensacola, Florida 32505.

172.   KAT Enterprises also is licensed as a pawnbroker in the State of Alabama. It holds pawnshop license number 5738, which was renewed most recently on or about December 1, 2018, by the Alabama State Banking Department, Bureau of Loans (Non-Depository). Pawnshop license number

PN3906 applies to KAT Enterprises' business location at 34612 U.S. Highway 98, Suite B, Lillian, Alabama 36549.

173.   KAT Enterprises previously was licensed as a Money Transmitter Part III by the Florida Office of Financial Regulation ("**FOFR**"). On or about May 4, 2004, FOFR issued license number FT30800184 to KAT Enterprises, d/b/a KAT Check Cashing, authorizing it to do business as a Money Transmitter. On April 24, 2013, FOFR revoked license number FT30800184.

174.   On or about October 2, 2000, King filed in the office of the Secretary of the State of Alabama an Application for Certificate of Authority of a Foreign Corporation to Transact Business in Alabama (the "**Alabama Qualification Application**") seeking to qualify KAT Enterprises to do business in the State of Alabama. A true and correct copy of the Alabama Qualification Application is attached to this Complaint as **Exhibit 34**. In the Alabama Qualification Application, King represented that he was KAT Enterprises' registered agent in the State of Alabama. King represented that his address was 34612 US Highway 98, Lillian, Alabama 36549. **Ex. 34**.

175.   Since filing the Alabama Qualification Application, KAT Enterprises has remained qualified to do business as a foreign corporation in the State of Alabama.

176.   Since filing the Alabama Qualification Application, King has continued to represent in KAT Enterprises' annual reports and returns to the Alabama Department of Revenue that he is KAT Enterprises' registered agent in the State of Alabama.

177.   King's representations to ADOR regarding KAT Enterprises' registered agent address were false, and King knew his representations were false.

178.   At all relevant times, King was a citizen of the State of Florida, residing in either Pensacola, Escambia County, Florida, or Gulf Breeze, Santa Rosa County, Florida.

179.   King made such representations with the intent that ADOR and the public at large should rely on them so that KAT Enterprises would remain qualified to do business as a foreign corporation in the State of Alabama. Without remaining qualified to do business as a foreign corporation in the State of Alabama, KAT Enterprises would not qualify for its license as a pawnbroker in the State of Alabama, and without a pawnbroker license in the State of Alabama, KAT Enterprises would be prohibited from engaging in title lending in the State of Alabama. Thus, the King Enterprises' illegal, interstate title lending scheme would lose its façade.

180.   Because KAT Enterprises does not have a registered agent in the State of Alabama, KAT Enterprises has never **properly** qualified to do business as a foreign corporation in the State of Alabama.

181.   In its filings with the Alabama Department of Revenue ("**ADOR**"), KAT Enterprises has represented that it is engaged in the business of "Title Pawn" as shown in the following table:

| KAT ENTERPRISES REPRESENTATIONS TO ADOR | | | | |
|---------|------------------|------------------|------------|-------|
| **Date** | **General Business** | **Address** | **City** | **State** |
| 10/02/07 | Title Pawn | None | None | FL |
| 07/13/09 | Title Pawn | 1040 Aquamarine Dr. | Gulf Breeze | FL |
| 03/11/10 | Title Pawn | 2818 N. Pace Blvd. | Pensacola | FL |
| 07/12/11 | Title Pawn | 2818 N. Pace Blvd. | Pensacola | FL |
| 05/10/11 | Title Pawn | 2818 N. Pace Blvd. | Pensacola | FL |
| 04/04/12 | Title Pawn | 2818 N. Pace Blvd. | Pensacola | FL |
| 05/14/13 | Title Pawn | 2818 N. Pace Blvd. | Pensacola | FL |
| 05/19/14 | Title Pawn | 2816 N. Pace Blvd. | Pensacola | FL |
| 10/23/15 | Title Pawn | 2816 N. Pace Blvd. | Pensacola | FL |
| 09/29/17 | Title Pawn | 6428 Pensacola Blvd | Pensacola | FL |
| 09/20/18 | Title Pawn | 6428 Pensacola Blvd | Pensacola | FL |

182.   Throughout its existence, KAT Enterprises has utilized the following fictitious names: KAT Check Cashing, Pensacola Specialty Pawn, Pensacola Title Loans, and Specialty Pawn.

### d.    2000 – Pensacola Title Loans

183.   On June 19, 2000, King filed with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "Pensacola

Title Loans." On September 22, 2005, King renewed the fictitious name filing for Pensacola Title Loans.

184.   On October 28, 2010, King filed an Application for Renewal of Fictitious Name for Pensacola Title Loans.

185.   On October 18, 2012, King assigned and transferred the fictitious name "Pensacola Title Loans" to KAT Enterprises. That day, he signed and filed with the Florida Secretary of State a new Application for Registration of Fictitious Name. True and correct copies of the June 19, 2000, Application for Registration of Fictitious Name and subsequent renewals for "Pensacola Title Loans" are attached to this Complaint as **Exhibit 35**.

186.   KAT Enterprises' fictitious name registration for "Pensacola Title Loans" expired on December 31, 2017, because KAT Enterprises never renewed its fictitious name registration. Despite the expiration of its fictitious name, KAT Enterprises has continued to do business as "Pensacola Title Loans."

187.   Pensacola Title Loans engages in interstate commerce through its website, www.pensacolatitleloan.com. Pensacolatitleloan.com's IP address is 104.25.59.33, which is hosted by Cloudflare, Inc., on servers located in San Francisco, California. Thus, any page views or visits to pensacolatitleloan.com would be routed through the Cloudfare's servers in the State of California, regardless of the geographical location of the device used to view the website.

### e.   2001 – Pensacola Specialty Pawn

188.   On September 26, 2001, King caused KAT Enterprises to file with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "Pensacola Specialty Pawn." From time to time thereafter, KAT Enterprises did business as "Pensacola Specialty Pawn." KAT Enterprises renewed its fictitious name filing for the name "Pensacola Specialty Pawn" in 2006, 2011, and 2016. True and correct copies of the September 26, 2001, Application for Registration of Fictitious Name and subsequent renewals for "Pensacola Specialty Pawn" are attached to this Complaint as **Exhibit 36**.

189.   Since registering "Pensacola Specialty Pawn" as a fictitious name, KAT Enterprises has, from time to time, acquired assets in its fictitious name.

### f.   2004 – KAT Check Cashing

190.   On April 12, 2004, Ms. Caroline J. King filed with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "KAT Check Cashing." According to the April 12, 2004, Application for Registration of Fictitious Name, both Ms. King and KAT Enterprises owned the name "KAT Check Cashing." Ms. King signed the April 12, 2004, Application for Registration of Fictitious Name on April 9, 2004.

191.   On December 18, 2009, King filed with the Florida Secretary of State an Application for Renewal of Fictitious Name, renewing the registration of the

name "KAT Check Cashing" on behalf of KAT Enterprises.[8] True and correct copies of the April 12, 2004, Application for Registration of Fictitious Name and subsequent renewals for "KAT Check Cashing" are attached to this Complaint as **Exhibit 37**.

192.   KAT Enterprises' fictitious name registration for "KAT Check Cashing" expired on December 31, 2014, because KAT Enterprises did not renew its fictitious name registration.

### g.   2014 – Specialty Pawn

193.   On May 6, 2014, King caused KAT Enterprises to file with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "Specialty Pawn." A true and correct copy of the May 6, 2014, Application for Registration of Fictitious Name is attached to this Complaint as **Exhibit 38**. From time to time thereafter, KAT Enterprises did business as "Specialty Pawn." KAT Enterprises' registration of the name "Specialty Pawn" will expire on December 31, 2019, unless renewed prior to that date.

### 2.   West Florida

194.   King incorporated West Florida on or about April 24, 1997, by filing with the Florida Secretary of State those certain Articles of Incorporation of West Florida Auto Exchange, Inc. (the **"West Florida Articles"**) dated as of April 17,

---

[8] On information and belief, Ms. Caroline J. King passed away on March 30, 2006.

1997. True and correct copies of the West Florida Articles are attached to this Complaint as **Exhibit 39**. The West Florida Articles identified King as the initial President and Secretary and Registered Agent of West Florida. **Ex. 39**. The West Florida Articles named Mr. Don Schroeder as West Florida's Vice President and Ms. Jessica L. Finley as West Florida's Treasurer. *Id*.

195.   On March 24, 1998, West Florida filed with the Florida Secretary of State its 1998 Profit Corporation Annual Report. A true and correct copy of the 1998 Profit Corporation Annual Report is attached to this Complaint as **Exhibit 40**. In the 1998 Profit Corporation Annual Report, West Florida removed Mr. Don Schroeder as Vice President and named Ms. Jessica Finley as Vice President and Treasurer. **Ex. 40**. In his capacity as the President of West Florida, King signed West Florida's 1998 Profit Corporation Annual Report on March 17, 1998. *Id*.

196.   On February 24, 1999, West Florida filed with the Florida Secretary of State its 1999 Profit Corporation Annual Report. A true and correct copy of the 1999 Profit Corporation Annual Report is attached to this Complaint as **Exhibit 41**. In the 1999 Profit Corporation Annual Report, West Florida removed Ms. Jessica Finley as Vice President and Treasurer and named Mr. Chance D. King as Vice President and Treasurer. **Ex. 41**. In his capacity as the President of West Florida, King signed West Florida's 1999 Profit Corporation Annual Report on January 5, 1999. *Id*.

197.   From 1999 to 2012, West Florida's officers and directors remained unchanged.

198.   On March 13, 2012, West Florida filed with the Florida Secretary of State those certain Articles of Amendment to Articles of Incorporation of West Florida Auto Exchange, Inc. True and correct copies of the March 13, 2012, Articles of Amendment are attached to this Complaint as **Exhibit 42**. In the 2012 Articles of Amendment, West Florida named Mr. Chance D. King and Ms. Judy K. Merritt as Vice Presidents. **Ex. 42**. The 2012 Articles of Amendment provided that they were adopted by King, as incorporator, without shareholder action, and that the amendment did not require shareholder approval. *Id*. On March 9, 2012, King signed the 2012 Articles of Amendment in his capacity as the President of West Florida. *Id*.

199.   On December 23, 2014, West Florida filed with the Florida Secretary of State those certain Articles of Amendment to Articles of Incorporation of West Florida Auto Exchange, Inc. True and correct copies of the December 23, 2014, Articles of Amendment to Articles of Incorporation of West Florida Auto Exchange, Inc. are attached to this Complaint as **Exhibit 43**. In the 2012 Articles of Amendment, West Florida removed Mr. Chance D. King as Vice President. **Ex. 43**. West Florida's 2014 Articles of Amendment represented that they were adopted by West Florida's shareholders with an adequate number voting for

approval. *Id*. King signed the 2014 Articles of Amendment as the President of West Florida on December 18, 2014. *Id*.

200.   On November 30, 2015, West Florida filed with the Florida Secretary of State that certain Statement of Change of Registered Office or Registered Agent or Both for Corporations. A true and correct copy West Florida's November 30, 2015, Statement of Change is attached to this Complaint as **Exhibit 44**. In its November 30, 2015, Statement of Change, West Florida changed its registered office address from Gulf Breeze, Santa Rosa County, Florida, to Pensacola, Escambia County, State of Florida. **Ex. 44**. According to the 2015 Statement of Change, "Such change was authorized by resolution duly adopted by its board of directors or by an officer so authorized by the board, or the corporation has been notified in writing of the change." *Id*. King signed the November 30, 2015, Statement of Change on November 24, 2015, in his capacity as President of West Florida. *Id*. King also signed the 2015 Statement of Change as West Florida's Registered Agent. *Id*. Since November 30, 2015, West Florida has adopted no other amendments to its Articles of Incorporation.

201.   West Florida is licensed as a Motor Vehicle Retail Installment Seller. It holds License No. MV9906909 issued by FOFR on or about March 16, 2012. West Florida's license as a Motor Vehicle Retail Installment Seller is current and scheduled to expire on December 31, 2020.

202.   West Florida also is licensed as a Consumer Collection Agency. It holds License No. CCA0900849 issued by FOFR on or about October 24, 2000. West Florida's license as a Consumer Collection Agency is current and scheduled to expire on December 31, 2019.

203.   Throughout its existence, West Florida has utilized fictitious names, including, without limitation, Viking Research, DFR Investigations, and Damage Free Recovery.

### a.    2000 – Viking Research

204.   On September 18, 2000, King caused West Florida to file with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "Viking Research." A true and correct copy of the September 18, 2000, Application for Registration of Fictitious Name is attached to this Complaint as **Exhibit 45**. From time to time thereafter, West Florida did business as Viking Research. King caused West Florida to renew its fictitious name filing for the name "Viking Research" in 2005, 2010, and 2015.

### b.    2002 – DFR Investigations

205.   On July 29, 2002, King caused West Florida to file with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "DFR Investigations." A true and correct copy of the July 29, 2002, Application for Registration of Fictitious Name is attached to this Complaint as

**Exhibit 46**. From time to time thereafter, West Florida did business as DFR Investigations.

206.   On December 10, 2007, King caused West Florida to renew its fictitious name filing for the name "DFR Investigations." West Florida's fictitious name registration for "DFR Investigations" expired on December 31, 2012, because West Florida did not renew its fictitious name registration.

### c.     2011 – Damage Free Recovery

207.   On April 20, 2011, King caused West Florida to file with the Florida Secretary of State an Application for Registration of Fictitious Name, registering the name "Damage Free Recovery." A true and correct copy of the April 20, 2011, Application for Registration of Fictitious Name is attached to this Complaint as **Exhibit 47**. From time to time thereafter, West Florida did business as Damage Free Recovery.

208.   Since registering "Damage Free Recovery" as a fictitious name, West Florida has, from time to time, acquired assets in its fictitious name.

209.   On September 28, 2016, King caused West Florida to renew its fictitious name filing for the name "Damage Free Recovery." West Florida's registration of the name "Damage Free Recovery" will expire on December 31, 2021, unless renewed prior to that date.

210.   Damage Free Recovery is licensed as a Recovery Agency. It holds License No. R 9700065 issued by the Florida Department of Agriculture and Consumer Services ("**FDACS**"). Damage Free Recovery's license as a Recovery Agency is current and scheduled to expire on March 31, 2021. Damage Free Recovery's recovery agency license is tied directly to King. King is licensed as a Recovery Agent. He holds License No. E 9800072 issued by FDACS. King's license as a Recovery Agent is current and scheduled to expire on July 16, 2020.

### 3.   KTTTC Investments

211.   King incorporated KTTTC on or about August 30, 2011, by filing with the Florida Secretary of State those certain Electronic Articles of Incorporation for KTTTC Investments, Inc. (the "**KTTTC Articles**") dated as of August 30, 2011. True and correct copies of the KTTTC Articles and KTTTC's subsequent annual reports are attached to this Complaint as **Exhibit 48**. The KTTTC Articles identified King as the initial director, President, and Registered Agent of KTTTC. **Ex. 48**.

212.   On April 15, 2015, KTTTC filed its 2015 Florida Profit Annual Report. According to KTTTC's 2015 Annual Report, King was KTTTC's registered agent and KTTTC's registered address was King's home address in Gulf Breeze, Santa Rosa County, Florida.

213.   On April 22, 2016, KTTTC filed its 2016 Florida Profit Annual Report. In KTTTC's 2016 Annual Report, KTTTC changed its registered address. According to KTTTC's 2016 Annual Report, King was KTTTC's registered agent and KTTTC's registered address was King's home address in Pensacola, Escambia County, Florida.

214.   Since KTTTC's incorporation, King has been KTTTC's sole shareholder, officer, and director.

### 4.   Terra Gulf Coast

215.   King organized Terra Gulf Coast on or about August 20, 2012, by filing with the Florida Secretary of State those certain Electronic Articles of Organization for Florida Limited Liability Company (the "**Terra Gulf Coast Articles**") dated as of August 20, 2012. True and correct copies of the Terra Gulf Coast Articles are attached to this Complaint as **Exhibit 49**. The Terra Gulf Coast Articles identified King as the managing member and Registered Agent of Terra Gulf Coast. **Ex. 49**.

216.   On April 15, 2015, Terra Gulf Coast filed its 2015 Florida Limited Liability Company Annual Report. According to Terra Gulf Coast's 2015 Annual Report, King was Terra Gulf Coast's registered agent, and Terra Gulf Coast's registered address was King's home address in Gulf Breeze, Santa Rosa County, Florida.

217.   On April 22, 2016, Terra Gulf Coast filed its 2016 Florida Limited Liability Company Annual Report. In Terra Gulf Coast's 2016 Annual Report, Terra Gulf Coast changed its registered address. According to Terra Gulf Coast's 2016 Annual Report, King was Terra Gulf Coast's registered agent and Terra Gulf Coast's registered address was King's home address in Pensacola, Escambia County, Florida.

218.   Since the organization of Terra Gulf Coast, King has been Terra Gulf Coast's sole member, manager, and/or managing member.

### B.   *The King Enterprise's wrongful and criminal conduct against the Plaintiffs originated through the King Enterprises extensive racketeering activities, and those activities presently.*

219.   As described in this Complaint, The King Enterprise has operated as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.

220.   The King Enterprise has long flouted federal law money laundering laws in violation of 18 U.S.C. § 1960.

221.   Pursuant to 18 U.S.C. § 1960, "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."[9]

222.   Section 1960 defines "unlicensed money transmitting business" as:

---

[9] 18 U.S.C. § 1960(a).

a money transmitting business which affects interstate or foreign commerce in any manner or degree and –

**(A)** is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

**(B)** fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section; or

**(C)** otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.[10]

### 1.    Money transmitting affecting interstate or foreign commerce in any manner or degree

223.   At all relevant times, the King Enterprise engaged in money transmitting within the meaning of 18 U.S.C. § 1960.

224.   From May 4, 2004, until April 24, 2013, KAT Enterprises operated as KAT Check Cashing and was a licensed money transmitter in the State of Florida.

225.   On information and belief, the King Enterprise continues to engage in money transmitting by transferring funds on behalf the public by wire, check, draft, facsimile, or courier.

226.   The King Enterprise's money transmitting activities affect interstate commerce. King is a citizen of the state of the Florida. King is the sole shareholder

---

[10] 18 U.S.C. § 1960(b)(1)(B).

of KAT Enterprises, West Florida, Pensacola Indoor Shooting Range, and KTTTC Investments. King is the sole member, manager, and/or managing member of Terra Gulf Coast. KAT Enterprises and West Florida operate their businesses at 6428 Pensacola Boulevard, Pensacola, Florida 32505, on property owned by Pensacola Indoor Shooting Range. KAT Enterprises owns and operates real and personal property situated at 34612 US Highway 98, Lillian, Alabama 36549 and currently conducts business in the State of Alabama as Pensacola Title Loans. KAT Enterprises qualified to do business in the State of Alabama in 2000 and at all relevant times has maintained such qualification. King is and at all relevant times has been KAT Enterprises' registered agent in both Florida and Alabama.

> **2.    Operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law**

227.   The King Enterprise has operated without appropriate money transmitting licenses in Florida and Alabama.

> **a.    Florida**

228.   Fla. Stat. § 560.125 prohibits any person from operating a money services business in Florida without obtaining an appropriate license. Fla. Stat. § 560.125(1).

229.   Under Florida law, a "money services business" includes any person acting "as a payment instrument seller, foreign currency exchanger, check casher,

or money transmitter," regardless of location if such person is doing business from, in, or into Florida or the United States. Fla. Stat. § 560.103(22).

230.   Under Florida law, a "money transmitter" is any entity that "receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means . . . ." Fla. Stat. § 560.103(23).

231.   Operating a money services business in Florida without an appropriate license is punishable as a felony. Fla. Stat. § 560.125(5)(a)-(c).

### b.   Alabama

232.   Until its repeal on August 1, 2017, the Sale of Checks Act prohibited any person from engaging in money transmission, or the sale of checks, in Alabama without obtaining a license. Ala. Code § 8-7-3.

233.   The Sale of Checks Act defined a "check" as "[a]ny check, draft, money order, or other instrument for the transmission or payment of money." Ala. Code § 8-7-2(3).

234.   Furthermore, the Sale of Checks Act prohibited any person from "engag[ing] in the business of selling, issuing, or otherwise dispensing checks or receiving money as agent for obligors for the purpose of paying such obligors' bills, invoices, or accounts" without first obtaining a license from the Alabama Securities Commission. Ala. Code § 8-7-3.

235.   Under the Sale of Checks Act, engaging in the sale of checks in Alabama without an appropriate license was punishable as a misdemeanor. Ala. Code § 8-7-15.

236.   Like its predecessor, the Sale of Checks Act, the Alabama Monetary Transmission Act, Ala. Code §§ 8-7A-1 to 8-7A-27, prohibits any person from engaging in money transmission in Alabama without obtaining an appropriate license.

237.   Under Alabama Monetary Transmission Act, "money transmission" as defined as "[s]elling or issuing payment instruments, stored value, or receiving money or monetary value for transmission." Ala. Code § 8-7A-2(10).

238.   Engaging in money transmission in Alabama without an appropriate license is punishable as a felony. Ala. Code § 8-7A-20(b)-(c).

239.   On information and belief, the King Enterprise has never been licensed to engage in money transmission under the Alabama Monetary Transmission Act.

### 3.   Failed to comply with 31 U.S.C. § 5330 or regulations prescribed thereunder

240.   The King Enterprise failed to comply with 31 U.S.C. § 5330 and its accompanying regulations.

241.   Pursuant to 31 U.S.C. § 5330, "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the

business is licensed as a money transmitting business in any State) with the Secretary of the Treasury." 31 U.S.C. § 5330(a)(1).

242. Under Section 5330, a "money transmitting business" is any business that: (A) "provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments"; (B) "is required to file reports under section 5313"; and (C) "is not a depository institution (as defined in section 5313(g))." 31 U.S.C. § 5330(d)(1); *see also* Regulation D: Reserve Requirements of Depository Institutions, 82 FR 28757-01.

### a.     Check cashing

243. At all relevant times, the King Enterprise provided check cashing, currency exchange, or money transmitting or remittance services, or issued or redeemed money orders, travelers' checks, and other similar instruments.

244. For example, in 2006, KAT Enterprises cashed checks made payable to Green and Gregory Green.

245. In February 2007, KAT Enterprises cashed a check drawn on First Acceptance Services, Inc.'s account at Suntrust Bank and made payable to Mr. Troy Demontquel Major in the amount of $8,374.12.

246. KAT Enterprises cashed additional checks in 2011 and 2012. In fact, KAT Enterprises' record-keeping deficiencies and violations of Chapter 560 of the

Florida Statutes related to its check cashing business led to the 2013 revocation of KAT Check Cashing's money transmitting license. On March 22, 2013, KAT Enterprises, d/b/a KAT Check Cashing, notified FOFR by email that it would agree to the revocation of its money transmitting license.

247.   Just days after agreeing to the revocation of its money transmitting license, on or about March 25, 2013, KAT Enterprises cashed a check made payable to Gregory Green in the amount of $8,000.00.

248.   On information and belief, KAT Enterprises is engaged presently in the business of cashing checks.

### b.   Required to file reports

249.   The Secretary of the Treasury has prescribed regulations that require each domestic financial institution (as defined by 31 U.S.C. § 5312) to "file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000," commonly known as a Currency Transaction Report or CTR. 31 C.F.R. § 1010.311.

250.   The King Enterprise is a domestic financial institution within the meaning of 31 U.S.C. § 5312, as shown in the following table:

| Statutory Reference | Business | Entity | License No. | State |
|---|---|---|---|---|
| 31 U.S.C. § 5312(a)(2)(K) | Issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments | KAT Enterprises | FT30800184 | FL |
| 31 U.S.C. § 5312(a)(2)(N) | Dealer in precious metals, stones, or jewels | KAT Enterprises | PN3906 | FL |
| 31 U.S.C. § 5312(a)(2)(O) | Pawnbroker | KAT Enterprises, d/b/a Pensacola Specialty Pawn | PN3906 | FL |
| 31 U.S.C. § 5312(a)(2)(O) | Pawnbroker | KAT Enterprises, d/b/a Pensacola Title Loan | PS5738 | AL |
| 31 U.S.C. § 5312(a)(2)(P) | Loan or finance company | West Florida | MV9906909 | FL |
| 31 U.S.C. § 5312(a)(2)(R) | Money transmitter | KAT Enterprises, d/b/a KAT Check Cashing | Revoked | FL |
| 31 U.S.C. § 5312(a)(2)(T) | Business engaged in vehicle sales, including automobile, airplane, and boat sales | West Florida | MV9906909 | FL |

251.   As a domestic financial institution, the King Enterprise is (and at all relevant times was) required to file Currency Transaction Reports.

### c.    Not a depository institution

252.   Section 5313(g) provides that "the term 'depository institution' has the meaning given to such term in section 19(b)(1)(A) of the Federal Reserve Act." 31 U.S.C. § 5313(g).[11]

253.   No member of the King Enterprise is an insured bank, a mutual savings bank, a savings bank, a credit union, an entity that has "subscribed for the

---

[11] Section 19(b)(1)(A) of the Federal Reserve Act has been codified at 12 U.S.C. § 461(b)(1)(A).

stock of a Federal Home Loan Bank," or any "savings association" under 12

U.S.C. § 1813(b)(1). Therefore, no member of the King Enterprise is a depository

institution.

### d.  Registration with FinCEN.

254.   The King Enterprise failed to register with the Financial Crimes

Enforcement Network, a bureau of the Department of the Treasury ("**FinCEN**"), as

required by as required by 31 C.F.R. § 1022.380.

255.   Pursuant to 31 C.F.R. § 1022.380, "each money services business

(whether or not licensed as a money services business by any State) must register

with FinCEN." 31 C.F.R. § 1022.380(a)(1).

256.   The FinCEN regulations include in the definition of "money services

business" check cashers, issuers or sellers of traveler's checks or money orders,

and money transmitters, "wherever located doing business, whether or not on a

regular basis or as an organized or licensed business concern, [or] wholly or in

substantial part within the United States." 31 C.F.R. § 1010.100(ff)(2), (3), and (5).

257.   Under the FinCEN regulations, a "check casher" is "[a] person that

accepts checks . . . or monetary instruments . . . in return for currency or a

combination of currency and other monetary instruments or other instruments, in

an amount greater than $1,000 for any person on any day in one or more

transactions." 31 C.F.R. § 1010.100(ff)(2).

258.   The FinCEN regulations define "monetary instrument" to include the following:

(i) Currency;

(ii) Traveler's checks in any form;

(iii) All negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes . . . and money orders) *that are either in bearer form, endorsed without restriction, . . . or otherwise in such form that title thereto passes upon delivery*; [and]

(iv) *Incomplete instruments* (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes . . . and money orders) signed but with the payee's name omitted . . . .

31 C.F.R. § 1010.100(dd)(1)(i)-(iv).

259.   At all relevant times, the King Enterprise was a check casher within the meaning of 31 C.F.R. § 1010.100(ff)(2). At all relevant times, the King Enterprise accepted monetary instruments in exchange for currency or other monetary instruments in an amount greater than $1,000 for any person on any day in one or more transactions.

260.   King testified in 2010 that he accepted blank checks, blank vehicle titles, and blank quit claims deeds as security for the loans he made to Green as early as 2005 or 2006. In the operation of its title loan business, the King Enterprise regularly holds blank vehicle titles. In 2013, KAT Enterprises was in

possession of the Western Star Certificate of Title executed in blank by Gregory Green.

261.   The FinCEN regulations define an "issuer of traveler's checks or money orders" as "[a] person that (i) [i]ssues traveler's checks or money orders that are sold in an amount greater than $1,000 to any person on any day in one or more transactions; or (ii) [s]ells traveler's checks or money orders in an amount greater than $1,000 to any person on any day in one or more transactions."

262.   At all relevant times, the King Enterprise was an issuer of traveler's checks or money orders within the meaning of 31 C.F.R. § 1010.100(ff)(3). At all relevant times, the King Enterprise (a) issued traveler's checks or money orders that were sold, or (b) sold traveler's checks or money orders, in an amount greater than $1,000 for any person on any day in one or more transactions.

263.   On information and belief, KAT Enterprises has issued or sold money orders and continues to issue or sell money orders at present.

264.   Because the King Enterprise is a "money services business," the King Enterprise is (and was) required to register with FinCEN, regardless of whether the King Enterprise was licensed by any State as a money services business, within 180 days after it began operating as a money services business. 31 U.S.C. § 5330(a); 31 C.F.R. § 1022.380(b)(3).

265.   KAT Enterprises received its initial license as a money transmitter from FOFR on May 4, 2004. KAT Enterprises' initial FinCEN registration was due on or before October 31, 2004; however, KAT Enterprises has never registered with FinCEN.

266.   Under Section 5330, King, individually, had the obligation to register KAT Enterprises with FinCEN. *See* 31 U.S.C. 5330(a); 31 C.F.R. § 1022.380(c).

267.   Since KAT Enterprises' incorporation on June 20, 2000, King has been the President, sole Director, and sole shareholder of KAT Enterprises. King, himself, was required to register KAT Enterprises with FinCEN, because he was the person who owned or controlled KAT Enterprises.

268.   Despite his obligation to do so, King has never registered KAT Enterprises, Pensacola Specialty Pawn, Pensacola Title Loans, or Specialty Pawn as a money services business with FinCEN.

### C.    *The King Enterprise engaged in illegal title loan lending transactions in Florida to defraud Green and others.*

269.   As described in this Complaint, the King Enterprise has never been licensed in Florida as a title loan lender, as required by the Florida Title Loan Act, Fla. Stat. §§ 537.001 to .018.

### 1. The King Enterprise knowingly defrauded Green, GFD Construction, and Green's Fill Dirt through its illegal title loan lending scheme.

270.   In sworn testimony in 2010, King admitted that in his dealings with Green, GFD Construction he and/or his businesses engaged in business as a title loan lender as early as 2005. According to King's testimony under oath, King regularly made title loans to Green for his personal use or for his businesses. King testified that Green would borrow money from King and/or his businesses, and King would accept certificates of title as collateral for those loans.

271.   Through those illegal title loans, the King Enterprise defrauded Green and others.

272.   For example, on or about January 22, 2007, at King's instruction, Gregory Green executed that certain Application for Vehicle/Vessel Certificate of Title pursuant to which he applied for a duplicate Certificate of Title for that certain 1984 Ford Dump Truck bearing VIN No. 1FDXN8086EVA52078.

273.   Upon receipt of the duplicate Certificate of Title, on January 22, 2007, at King's instruction, Gregory Green executed the duplicate Certificate of Title purportedly on behalf of GFD Construction by which he caused GFD Construction to convey to West Florida the 1984 Ford Dump Truck. Gregory Green signed the January 22, 2007, Certificate of Title "for GFD Construction."

274.   At the time he executed the January 22, 2007, Certificate of Title, Gregory Green was not an officer, director, shareholder, or agent of GFD Construction. At that time, Gregory Green had no authority to act on behalf of Green or GFD Construction.

275.   Shortly thereafter, on or about April 17, 2007, at King's instruction, Ms. Casey Greene executed that certain Application for Certificate of Title pursuant to which she caused West Florida to obtain a new Certificate of Title in West Florida's name and showing TAT Enterprises as West Florida's lessee and United Bank of Milton as the secured party holding a lien against the 1984 Ford Dump Truck.

276.   Similarly, on or about April 16, 2007, at King's instruction, Ms. Finley executed that certain Certificate of Title pursuant to which she caused Green's Fill Dirt to convey to West Florida that certain 1993 Ford Dump Truck bearing VIN No. 1FDZU82E9PVA19528. Ms. Finley signed the April 16, 2007, Certificate of Title as "Tony Green President" without any authority from Green to do so.

277.   On or about May 1, 2007, West Florida sought a new Certificate of Title for the 1993 Ford Dump Truck showing United Bank as the secured party/lien holder. According to the May 1, 2007, Certificate of Title, West Florida granted United Bank a security interest in the 1993 Ford Dump Truck on April 16, 2007,

the same day Ms. Finley forged Green's name to the April 16, 2007, Certificate of Title.

278.   In sworn testimony in 2010, King admitted that Ms. Finley was on one of his employees and that she forged Green's name to the April 16, 2007, Certificate of Title.

279.   At the time of transactions described in paragraphs 288 to 293, none of the Defendants held a license as a title loan lender in Florida as required by Fla. Stat. § 537.004. As a result, the transactions described in paragraphs 288 to 293 were void. *See* Fla. Stat. § 537.007.

280.   The King Enterprise engaged in illegal title loan lending transactions not only with regard to Green and GFD Construction, but also with others.

### 2.   The King Enterprise knowingly defrauded Milton Chevrolet through its illegal title loan lending scheme.

281.   On or about July 24, 2009, Ms. Wendy Moye ("**Moye**") purchased a 2009 Chevrolet Tahoe from Milton Chevrolet, Inc. ("**Milton Chevrolet**"), in Milton, Santa Rosa County, Florida.

282.   Moye gave Milton Chevrolet a check in the amount of $44,364.48 drawn on Robert Moye's account at Regions Bank for the vehicle. On information and belief, Robert Moye was Moye's father. On information and belief, Moye forged her father's signature on the check without Robert Moye's authorization.

283.   That same day, after received the check from Moye, Milton Chevrolet delivered the 2009 Chevrolet Tahoe bearing VIN No. 1GNEC23329R160783 (the "**2009 Tahoe**") to Moye.

284.   On or about July 24, 2009, Moye executed that certain Application for Certificate of Title With/Without Registration, in which she requested a certificate of title for the 2009 Tahoe. At that time, Moye obtained a Certificate of Title bearing Title Number 102815520 for the 2009 Tahoe.

285.   At some point between July 24, 2009, and August 17, 2009, Regions Bank returned Moye's check for insufficient funds. Milton Chevrolet immediately notified Moye that Regions Bank had returned the check.

286.   On August 20, 2009, Moye borrowed $5,000.00 from KAT Enterprises, d/b/a Pensacola Title Loans, at KAT Enterprises' business address 2816 N. Pace Boulevard, Pensacola, Escambia County, Florida.

287.   In fact, Moye repeatedly borrowed money from KAT Enterprises, d/b/a Pensacola Title Loans, between August 20, 2009, and September 2, 2009, as shown in the following table:

| Loan Date | Maturity Date | Title Loan No. | Amount | Monthly % | APR |
|-----------|---------------|----------------|--------|-----------|-----|
| 08/20/09 | 09/19/09 | 1185 | $5,000.00 | 22.0% | 264.0% |
| 08/24/09 | 09/23/09 | 7200 | $3,200.00 | 22.0% | 264.0% |
| 08/26/09 | 09/25/09 | 7203 | $3,000.00 | 22.0% | 264.0% |
| 09/02/09 | 10/02/09 | 7212 | $3,000.00 | 22.0% | 264.0% |
| **Total** | | | **$14,200.00** | | |

288.   On August 20, 2009, Moye and KAT Enterprises d/b/a Pensacola Title Loans entered into a title loan transaction, title loan number 1185, at KAT Enterprises' place of business at 2816 Pace Boulevard, Pensacola, Escambia County, Florida. KAT Enterprises loaned Moye $5,000.00, and Moye pledged the 2009 Tahoe as collateral for the loan from KAT Enterprises.

289.   On August 24, 2009, Moye and KAT Enterprises d/b/a Pensacola Title Loans entered into another title loan transaction, title loan number 7200, at KAT Enterprises' place of business at 2816 Pace Boulevard, Pensacola, Escambia County, Florida. That day, Moye and KAT Enterprises renewed Moye's existing title loan number 1185, entered into an additional $3,200 advance from KAT Enterprises to Moye, and renewed the pledge of the 2009 Tahoe as collateral for KAT Enterprises' loan to Moye.

290.   On August 25, 2009, deputies of the Santa Rosa County, Florida, Sheriff's Department spoke with Moye, and Moye represented to those deputies that on August 26, 2009, she would have money to cover the amounts she owed Milton Chevrolet.

291.   On August 26, 2009, Moye notified the Santa Rosa County, Florida, Sheriff's Department, that she would not have the money she owed Milton Chevrolet and that she would have the 2009 Tahoe towed to Milton Chevrolet.

292. Later that day, Moye had the 2009 Tahoe towed to Milton Chevrolet.

293. To avoid the loss on KAT Enterprises' loans to Moye, King and Moye conspired to defraud Milton Chevrolet to transfer ownership of the 2009 Tahoe to KAT Enterprises.

294. On August 26, 2009, Moye and KAT Enterprises renewed Moye's existing $8,200.00 loan, entered into an additional $3,000 advance from KAT Enterprises to Moye, and renewed the pledge of the 2009 Tahoe as collateral for KAT Enterprises' loan to Moye.

295. As of August 26, 2009, Moye owed $11,200.00 to KAT Enterprises; however, up to that point, KAT Enterprises had no security interest in the 2009 Tahoe. So, on August 26, 2009, with knowledge that Moye had returned the 2009 Tahoe to Milton Chevrolet, KAT Enterprises filed a an Application for a Certificate of Title requesting that KAT Enterprises be identified as the lienholder.

296. On August 26, 2009, Moye and KAT Enterprises d/b/a Pensacola Title Loans entered into another title loan transaction, title loan number 7203, at KAT Enterprises' place of business at 2816 Pace Boulevard, Pensacola, Escambia County, Florida. That day, Moye and KAT Enterprises renewed Moye's existing title loan number 7200, entered into an additional $3,000 advance from KAT Enterprises to Moye, and renewed the pledge of the 2009 Tahoe as collateral for KAT Enterprises' loan to Moye.

297.   On September 2, 2009, Moye and KAT Enterprises d/b/a Pensacola Title Loans entered into another title loan transaction, title loan number 7212, at KAT Enterprises' place of business at 2816 Pace Boulevard, Pensacola, Escambia County, Florida. That day, Moye and KAT Enterprises renewed Moye's existing title loan number 7203, entered into an additional $3,000 advance from KAT Enterprises to Moye, and renewed the pledge of the 2009 Tahoe as collateral for KAT Enterprises' loan to Moye.

298.   In each instance, KAT Enterprises extended or renewed Moye's original loan with additional advances. Over the course of just 13 days, KAT Enterprises made its initial loan to Moye in the amount of $5,000.00 and increased that loan amount to $14,200.00.

299.   As of September 2, 2009, Moye owed KAT Enterprises $17,324.00, including principal in the amount of $14,200.00 and finance charges in the amount of $3,124.00.

300.   Moye pledged the 2009 Tahoe as collateral for the original loan and each subsequent advance, and KAT Enterprises accepted Moye's pledge of the 2009 Tahoe as collateral for the original loan and each subsequent advance.

301.   Each receipt evidencing KAT Enterprises' loan(s) to Moye was stamped with the words "HOLDING CERTIFICATE OF TITLE FOR."

302.   Moye signed each receipt evidencing KAT Enterprises' loan(s) to her.

303.   KAT Enterprises signed each receipt evidencing KAT Enterprises' loan(s) to Moye.

304.   On or about October 16, 2009, Moye executed an untitled document (the "**Moye Assignment**") that provided:

> I **Wendy Joan Moye** on **10/16/2009** do hereby sell and transfer all of my rights, interest, & equity in 2009 Chevrolet Tahoe **Vin#l GNEC23329R160783** to Kat Enterprises of Pensacola Inc for **$1200.00 Check#l2279** and forgiveness of debt owed to Pensacola Title Loan in the amount of **$18781.20** for total sales price of **$19,981.20.**

(emphasis original).

305.   Mr. Kirk Skinner and Mr. Robert Lankford, employees of King's, witnessed Moye's signature on the Moye Assignment. At the time Moye executed the Moye Assignment, Moye had actual knowledge that she did not own the 2009 Tahoe and that she had returned the 2009 Tahoe to Milton Chevrolet.

306.   At the time Messrs. Skinner and Lankford witnessed Moye's execution of the Moye Assignment, Messrs. Skinner and Lankford had actual knowledge that Moye did not own the 2009 Tahoe and that Moye had returned the 2009 Tahoe to Milton Chevrolet.

307.   On or about October 16, 2009, King and Moye both executed that certain Cash Sale Form and Bill of Sale pursuant to which Moye sold the 2009 Tahoe to KAT Enterprises. A true and correct copy of the Cash Sale Form and Bill

of Sale is attached to this Complaint as **Exhibit 50**. Mr. Lankford witnessed King's and Moye's signatures on the Cash Sale Form and Bill of Sale. **Ex. 50**.

308.   At the time King signed the Cash Sale Form and Bill of Sale on behalf of KAT Enterprises, King had actual knowledge that Moye did not own the 2009 Tahoe and that Moye had returned the 2009 Tahoe to Milton Chevrolet.

309.   At the time Moye signed the Cash Sale Form and Bill of Sale, Moye had actual knowledge that Moye did not own the 2009 Tahoe and that Moye had returned the 2009 Tahoe to Milton Chevrolet.

310.   On or about October 16, 2016, KAT Enterprises filed an Application for a Certificate of Title seeking to have the 2009 Tahoe reissued in its name as the registered owner. That day, KAT Enterprises received a Certificate of Title to the 2009 Tahoe.

311.   At the time King KAT Enterprises applied for the Certificate of Title to the 2009 Tahoe, King had actual knowledge that Moye did not own the 2009 Tahoe and that Moye had returned the 2009 Tahoe to Milton Chevrolet.

312.   On or about December 11, 2009, King caused KAT Enterprises to file that certain civil action styled *KAT Enterprises of Pensacola, Inc. v. Milton Chevrolet, Inc.*, Circuit Court of Santa Rosa County, Florida, Case No. 2009-CA-002225 (the "***KAT v. Milton* Lawsuit**"). King personally signed and verified the Complaint (the "***KAT v. Milton* Complaint**") filed in the *KAT v. Milton* Lawsuit. A

true and correct copy of the *KAT v. Milton* Complaint is attached to this Complaint as **Exhibit 51**.

313.   In the *KAT v. Milton* Complaint, King alleged ***under penalty of perjury*** that Milton Chevrolet wrongfully detained the 2009 Tahoe because KAT Enterprises owned the 2009 Tahoe. **Ex. 51**, ¶ 5.

314.   King's representations under penalty of perjury in the *KAT v. Milton* Complaint were false, and King knew his representations under penalty of perjury in the *KAT v. Milton* Complaint were false.

315.   At all relevant times, King had actual knowledge of Milton Chevrolet's superior claims to the 2009 Tahoe.

316.   At all relevant times, King had actual knowledge that Moye returned the 2009 Tahoe to Milton Chevrolet because the check Moye took and forged to pay for the 2009 Tahoe was returned for insufficient funds.

317.   At all relevant times, King had actual knowledge that KAT Enterprises took no security interest in the 2009 Tahoe until ***after*** Moye notified KAT Enterprises that she had returned the 2009 Tahoe to Milton Chevrolet.

318.   On or about February 16, 2010, the court in the *KAT v. Milton* Case conducted a hearing to determine whether the 2009 Tahoe should be delivered by Milton Chevrolet to KAT Enterprises. At that time, KAT Enterprises admitted that both Milton Chevrolet and the Santa Rosa County, Florida, Sheriff's Department,

had notified KAT Enterprises prior to October 16, 2009, that Moye fraudulently

obtained the 2009 Tahoe.

319.   On August 30, 2010, KAT Enterprises voluntarily dismissed the *KAT*

*v. Milton* Case.

320.   The next day, on August 31, 2010, KAT Enterprises, through its

affiliate, West Florida, entered Milton Chevrolet's property and took possession of

2009 Tahoe, and removed the 2009 Tahoe from Milton Chevrolet's property.

321.   Then, on or about October 7, 2010, KAT Enterprises sold the 2009

Tahoe in Pensacola, Escambia County, Florida, completing its fraud against Milton

Chevrolet.

> **3.   In 2013 and 2014, the King Enterprise knowingly defrauded Empire Truck Sales through its illegal title loan lending scheme.**

322.   Empire Truck Sales, LLC ("**Empire**"), is an authorized dealer of

Freightliner and Western Star commercial trucks, Thomas Built buses, and Detroit

Diesel Engines. Empire operates showrooms and service centers in Alabama,

Florida, Mississippi, and Louisiana. Empire conducts business in interstate

commerce.[12]

---

[12] https://www.empiretruck.com.

323.   On or about March 1, 2013, Mr. Anthony Green, Jr. ("**Little Tony**"), contacted Empire because he was interested in purchasing two dump trucks for his business, Superior Waste & Land Clearing, LLC ("**Superior Waste**").[13]

324.   On or about March 15, 2013, Empire demonstrated two Western Star Model 4700 dump trucks at Superior Waste in Pensacola, Florida. At that time, Little Tony explained that he would purchase both trucks, but one of the trucks was to be transferred to Gregory Green. Little Tony and Gregory Green provided Empire with the information necessary to transfer one of the trucks to Gregory Green. Little Tony wrote a check to Empire in the amount of $10,000.00 drawn on Pen Air Federal Credit Union ("**Pen Air**") as a deposit on the trucks.

325.   On or about March 20, 2013, Little Tony met with Empire's employees to finalize the purchase of the two trucks from Empire and wrote a check for the purchase. Little Tony gave Empire check number 0112 in the amount of $430,590.16 drawn on Pen Air for the two trucks and other equipment. Then, Empire delivered the two trucks to Little Tony and Gregory Green at Superior Waste in Pensacola, Florida.

326.   At that time, Empire transferred one Western Star Model 4700 SF truck bearing VIN 5KKMAVDV5DPFB8536 (the "**Western Star Truck**"), along with a 16 foot, 12 cubic yard Stampede dump body bearing serial number

---

[13] Mr. Anthony Green, Jr., or Little Tony as he is known, is Plaintiff Green's son.

5133001333684AL, to GB Green Construction Management & Consulting, Inc.

("**GB Green Construction**"), pursuant to that certain Bill of Sale dated as of

March 19, 2013, between GB Green Construction and Empire. Anthony Green, Jr.

signed the Bill of Sale as, or on behalf of, the Purchaser.

327.   According to the Bill of Sale, the sale price of the Western Star Truck

was $137,911.00. With other fees, service contract, and sales tax, the total selling

price of the Western Star Truck was $165,295.08.

328.   On or about March 21, 2013, Gregory Green signed a State of Florida

Application for Vehicle/Vessel Certificate of Title (the "**GB Green Title**

**Application**"), seeking to title the Western Star Truck in the name of GB Green

Construction in the State of Florida. A true and correct copy of the GB Green Title

Application is attached to this Complaint as **Exhibit 52**.

329.   The GB Green Title Application specifically requested an original

new vehicle certificate of title from the State of Florida for the Western Star truck.

**Ex. 52**. According to the GB Green Title Application, there was no lien on the

Western Star Truck at the time Gregory Green applied for a Florida certificate of

title. *Id*. Gregory Green represented that GB Green Construction acquired the

Western Star Truck on March 18, 2013, for $140,441.00, plus applicable sale tax of

$151.80. *Id*.

330.   In the GB Green Title Application, Gregory Green certified as

follows:

> I/WE HEREBY CERTIFY THAT I/WE LAWFULLY OWN THE
> ABOVE DESCRIBED VEHICLE/VESSEL, AND MAKE
> APPLICATION FOR TITLE. IF LIEN IS BEING RECORDED
> NOTICE IS HEREBY GIVEN THAT THERE IS AN EXISTING
> WRITTEN LIEN INSTRUMENT INVOLVING THE
> VEHICLE/VESSEL DESCRIBED ABOVE AND HELD BY LIEN
> HOLDER SHOWN ABOVE. I/WE FURTHER AGREE TO
> DEFEND THE TITLE AGAINST ALL CLAIMS.
>
> UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE
> READ THE FOREGOING DOCUMENT AND THAT THE FACTS
> STATED IN IT ARE TRUE.

*Id*. (capitalization original).

331.   On or about March 21, 2013, the State of Florida issued Certificate of

Title Number 111341893 (the "**Western Star Title**") for the Western Star Truck in

the name of GB Green Construction. A true and correct copy of the **Western Star**

**Title** is attached to this Complaint as **Exhibit 53**.

332.   The Western Star Title reflected that no party held a lien against the

title to the Western Star Truck. **Ex. 53**.

333.   Within days after Empire delivered the two trucks to Little Tony,

Pen Air returned check number 0112 because there were insufficient funds

available in Superior's account to pay the check.

334.   As a result, Empire notified both Little Tony and Gregory Green that

it intended to take possession of both trucks for non-payment.

335.   On or about April 9, 2013, Empire took possession of the trucks, including the Western Star Truck transferred to GB Green Construction, for non-payment and transferred the trucks from Pensacola, Florida, to Mobile, Alabama; however, by the time it took possession of the Western Star Truck, Gregory Green had delivered the **Western Star Title** to King.

336.   On or about March 25, 2013, Gregory Green met with King at Pensacola Specialty Pawn in Pensacola, Florida, and borrowed $8,000.00. King caused KAT Enterprises to issue a check to Gregory Green in the amount of $8,000.00. Upon receipt of the check, Gregory Green cashed the check at Pensacola Specialty Pawn in Pensacola, Florida.

337.   At the time Gregory Green cashed the check from KAT Enterprises, King and KAT Check Cashing had already agreed to the revocation of its money transmitting license.

338.   At the time Gregory Green cashed the check from KAT Enterprises, KAT Enterprises was not registered with FinCEN as a money services business pursuant to 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380.

339.   At or about the same time, Gregory Green signed the **Western Star Title** in blank and delivered the **Western Star Title** to King as collateral to secure the $8,000.00 loan from KAT Enterprises.

340.   At the time Gregory Green delivered the **Western Star Title** to King as collateral to secure KAT Enterprises' $8,000.00 loan, none of King, nor KAT Enterprises, nor Pensacola Specialty Pawn was licensed in the State of Florida as a title loan lender pursuant to the Florida Title Loan Act, Fla. Stat. § 537.004.

341.   When Empire took possession of the Western Star Truck from Gregory Green and/or GB Green Construction, Gregory Green notified Empire that King and KAT Enterprises were in possession of the Certificate of Title to the Western Star Truck.

342.   Gregory Green also notified King that Empire had taken possession of the Western Star Truck.

343.   On or about June 7, 2013, Empire's employees met with King to discuss King's interest in purchasing trucks from Empire. While discussing the possible purchase of trucks for King's heavy equipment leasing business (presumably, West Florida), King inquired into purchasing the Western Star Truck at some discount from the original sale price. When Empire's employees explained to King that Empire had repossessed the Western Star Truck because of non-payment, King notified Empire's employees that he was aware of the repossession. King explained also that he had asked Gregory Green to endorse the Certificate of Title so that King could provide the executed Certificate of Title to Empire. At that

time, King offered to return the Certificate of Title to Empire in exchange for $2,000.00.

344.   Shortly thereafter, in July 2013, Empire employees again met with King. In their July 2013 meeting, King explained that Gregory Green had borrowed approximately $39,000.00 from him. King offered to deliver the Certificate of Title to Empire upon payment of the $39,000.00 Gregory Green had borrowed from him.

345.   Empire refused to pay King for the Certificate of Title to the Western Star Truck.

### a.   September 25, 2013 – Promissory Note

346.   After attempting to extort $39,000.00 from Empire, and with full knowledge of Empire's claims to the Western Star Truck, on or about September 25, 2013, King caused one of KAT Enterprises' employees, Ms. Sarah Stanley ("**Ms. Stanley**"), to prepare a promissory note for execution by Gregory Green. At that time, Ms. Stanley was a registered notary public in the State of Florida holding commission number EE 012959. That day, Gregory Green executed that certain Promissory Note by Gregory Green in favor of KAT Enterprises dated as of September 25, 2013, in the original principal amount of $8,000.00 (the "**GB Green Promissory Note**"). A true and correct copy of the GB Green Promissory Note is attached to this Complaint as **Exhibit 54**.

347. The GB Green Promissory Note recited as follows:

GREGORY B. GREEN and/or GB GREEN CONSTRUCTION
MANAGEMENT & CONSULTING, INC., the undersigned,
(hereinafter called "Maker"), jointly and severally, promises to pay to
KAT ENTERPRISES OF PENSACOLA, INC. dba PENSACOLA
TITLE LOANS (hereinafter called "Lender"), payable at 2816 N.
PACE BLVD., PENSACOLA, FL 32505, or such other place
specified by Lender in writing, amount due $8,000.00 with 0.0 %
interest, payable in full in March 24, 2013 (180) DAYS from the date
of this Note.

**Ex. 54**.

348. According to the GB Green Promissory Note, Gregory Green and GB
Green Construction pledged the Western Star Truck as collateral for the loan
evidenced by the GB Green Promissory Note. *Id*. The GB Green Promissory Note
provided: "Maker has Pledged, assigned or granted to Lender as collateral for
payment of this liability (hereinafter called 'Obligation'), the following: [the
Western Star Truck]." *Id*.

349. The GB Green Promissory Note provided also that "[u]pon the
occurrence of any [ ] event of default or at any time thereafter, [KAT Enterprises]
shall have the remedies of a secured party under Uniform Commercial Code of
Florida as applicable to the security." *Id*.

350. According to the Promissory Note, Gregory Green signed the GB
Green Promissory Note on September 25, 2013, in his individual capacity and on
behalf of GB Green Construction. *Id*. Gregory Green executed the Promissory

Note in Escambia County, Florida, and Ms. Stanley notarized Gregory Green's

signature on the GB Green Promissory Note as of September 25, 2013. *Id*.

351.   At the time Gregory Green signed the GB Green Promissory Note

pledging the Western Star Truck as collateral to secure the loan evidenced by the

Promissory Note, neither King nor KAT Enterprises was licensed in Florida as a

title loan lender under the Florida Title Loan Act, Fla. Stat. § 537.004.

### b.      October 7, 2013 – Lien Application

352.   On or about October 2, 2013, GB Green Construction submitted to the

Escambia County Tax Collector that certain Application for Notice of Lien, dated

as of October 1, 2013. A true and correct copy of the Application for Notice of

Lien, dated as of October 1, 2013, is attached to this Complaint as **Exhibit 55**.

353.   In the Application for Notice of Lien, GB Green Construction

represented that, as of October 1, 2013, it granted to KAT Enterprises a first

priority lien against the title to the Western Star Truck pursuant to a "[a] security

agreement, retain title contract, conditional bill of sale, chattel mortgage or other

similar instrument [that] was executed prior to the date of the filing of this notice

of lien." **Ex. 55**.

354.   The Application for Notice of Lien included the following

certification: "UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE

READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE." *Id*. (capitalization original).

355.   Gregory Green signed the Application for Notice of Lien on behalf of GB Green Construction. *Id*.

356.   On or about October 6, 2013, Empire notified GB Green Construction by certified mail that it intended to auction the Western Star Truck on October 29, 2013. A true and correct copy of Empire's October 6, 2013, notice to GB Green Construction is attached to this Complaint as **Exhibit 56**.

357.   On October 7, 2013, Gregory Green and GB Green Construction received Empire's October 6, 2013, notice.

358.   That same day, on October 7, 2013, King caused KAT Enterprises to file a State of Florida Application for Vehicle/Vessel Certificate (the "**KAT Title Application**"). A true and correct copy of the KAT Title Application is attached to this Complaint as **Exhibit 57**. The KAT Title Application requested "Lien maintenance retained as electronic title." **Ex. 57**. According to the KAT Title Application, KAT Enterprises acquired a lien against the Certificate of Title to the Western Star Truck on October 1, 2013. *Id*.

359.   On or about October 7, 2013, the State of Florida issued a new Certificate of Title reflecting that KAT Enterprises held a first priority lien in and to

the Western Star Truck. A true and correct copy of the October 7, 2013, Certificate of Title is attached to this Complaint as **Exhibit 58**.

        **c.**      **October 10, 2013 – Cross-Collateralization and Cross-Default Agreement**

360.   On October 10, 2013, Gregory Green, GB Green Construction, and KAT Enterprises entered into that certain Cross-Collateralization and Cross-Default Agreement (the "**Cross-Collateralization Agreement**"), pursuant to which Gregory Green and GB Green Construction pledged the Western Star Truck as collateral to secure not only the Promissory Note, but also two Alabama Motor Vehicle Title Pawn Contracts between GB Green Construction and KAT Enterprises. A true and correct copy of the Cross-Collateralization Agreement is attached to this Complaint as **Exhibit 59**.

361.   In the Cross-Collateralization Agreement, King and KAT Enterprises required Gregory Green and GB Green Construction to pledge the Western Star Truck as collateral for other loans. **Ex. 59**. The Cross-Collateralization Agreement provided as follows:

> WHEREAS, as a part of the consideration and as additional security for the "Lender" making loans to GREGORY B. GREEN and GB GREEN CONSTRUCTION MANAGEMENT & CONSULTING, INC., the "Lender" has required and the "Borrowers [sic] have agreed to enter into this **CROSS-COLLATERALIZATION AND CROSS-DEFAULT AGREEMENT** as hereinafter set forth.

*Id*. at 1 (emphasis original).

362.   The Cross-Collateralization Agreement cross-defaulted the following title loans (the "**GB Green Title Loans**"):

| Loan | Date | Amount | Int. Rate | Collateral |
|------|------|--------|-----------|------------|
| Alabama Motor Vehicle Title Pawn Contract No. 5910-0 | 07/26/13 | $7,500.00 | 22.00% | 2000 White Mack Dump Truck VIN: 1M2P267CXYM048858 |
| Alabama Motor Vehicle Title Pawn Contract No. 8911-0 | 07/26/13 | $7,500.00 | 22.00% | 1998 White Peterbilt Dump Truck VIN: INPALA0X7WN448934 |
| Promissory Note | 09/25/13 | $8,000.00 | 0.0% | 2013 Western Star VIN: 5KKMAVDV5DPFB8536 |

*Id.*, ¶ 2 at 1-2.

363.   The Cross-Collateralization Agreement provided as follows:

That any default under any other terms and provisions of any one of the [Title Loans] or under any of the terms and provisions of any deed of trust, security agreement or guaranty agreement securing any such obligation or in the terms and provisions of any Loan Agreement or any other loan documentation relating to any such obligation, shall constitute a default under all of the [Title Loans], as well as under all of the deed(s) of trust, security agreement(s), and/or guaranty agreement(s) and/or securing any or all of said obligations and any Loan Agreement(s) which govern said obligations, and any such default shall entitle Lender to exercise each and every right available to it under each and every of said documents, including, but not limited to, the right to foreclose against and sell any collateral, whether real or personal, securing any of said obligations as if said collateral secured all of said obligations.

*Id.*, ¶ 1 at 1.

364.   Gregory Green signed the Cross-Collateralization Agreement individually and in his capacity as President of GB Green Construction, and King signed the Cross-Collateralization Agreement as the President of KAT Enterprises. *Id.*

365.   At the time Gregory Green and King signed the Cross-Collateralization Agreement, King and Gregory Green possessed actual knowledge of Empire's superior claims with respect to the Western Star Truck.

366.   At the time Gregory Green and King signed the Cross-Collateralization Agreement, neither King nor KAT Enterprises was licensed in Florida as a title loan lender under Florida Title Loan Act, Fla. Stat. § 537.004.

367.   The same day, Gregory Green sent a letter by US Mail to Empire in which he wrote, "[p]lease let me know the total amount required to pay the entire claim stated in your notice so that my truck will not be sold." A true and correct copy of GB Green Construction's October 10, 2013, letter to Empire is attached to this Complaint as **Exhibit 60**. On information and belief, Gregory Green sent October 10, 2013, letter at King's instruction and urging.

368.   In his October 10, 2013, letter, Gregory Green made no mention of the GB Green Title Loans; the October 2, 2013, Application for Notice of Lien; the September 25, 2013, GB Green Promissory Note; the October 7, 2013, KAT Title Application; or the October 10, 2013, Cross-Collateralization Agreement. *Id.*

369.   On October 16, 2013, Empire replied to GB Green Construction's October 10, 2013, letter. A true and correct copy of Empire's October 16, 2013, letter to GB Green Construction is attached to this Complaint as **Exhibit 61**. In its October 16, 2013, letter, Empire wrote:

92

In response to your letter dated 10/10/13, the following are the current charges assessed from the date of the original Bill of Sale (attached). The letter that was initially sent out was a generic "abandoned" letter, so I have included a new letter removing the "abandoned" verbiage. The date, time and place of the sale remain the same.

| | | |
|---|---|---|
| Bill of Sale amount | | $165,295.08 |
| Bill of Sale date | 3/19/2013 | |
| Interest rate | 4.5% | |
| Interest charge | $20.37 per day x 210 days | $4,277.70 |
| Ad in paper | | $88.02 |
| Total required to redeem this truck | | $169,660.80 |

In order to redeem this truck, we will need a cashier's check in the amount stated above.

**Ex. 61**.

370.   On Saturday, October 26, 2013, just three calendar days and one business day before the scheduled sale of the Western Star Truck, GB Green Construction filed that certain civil action styled *GB Green Construction Management & Consulting, Inc. v. Empire Truck Sales, LLC, and KAT Enterprises of Pensacola, Inc.*, Circuit Court of Escambia County, Florida, Case No., 2013CA0002344 (the "**Truck Title Lawsuit**"). A true and correct copy of GB Green Construction's Demand for Hearing Prior to Non-Judicial Sale of Personal; Property (Fla. Stat. § 713.585(1)) (the "**Truck Title Complaint**") filed in the Truck Title Lawsuit is attached to this Complaint as **Exhibit 62**.

371.   In the Truck Title Complaint, GB Green Construction admitted that Gregory Green, GB Green Construction, King, and KAT Enterprises entered into an illegal title loan transaction. **Ex. 62**, ¶ 11 at 3.

372.   With actual knowledge that the allegations of its complaint were false, GB Green Construction alleged that Empire entered its property and took possession of the Western Star Truck under false pretenses. *Id*., ¶ 14 at 4.

### d.   February 21, 2014 – Repossession

373.   Shortly after GB Green Construction filed the Truck Title Case, on February 21, 2014, the King Enterprise repossessed the Western Star Truck from Empire. King caused West Florida, d/b/a Damage Free Recovery, to retrieve the Western Star Truck from Empire's dealership property in Mobile, Alabama, and deliver the Western Star Truck to Pensacola, Florida.

374.   King and/or West Florida and/or his or its or their agents crossed state lines from Florida into Alabama to take possession of the Western Star Truck in Mobile, Alabama.

375.   After taking possession of the Western Star Truck, King and/or West Florida and/or his or its or their agents crossed from Alabama into Florida to deliver the Western Star Truck to Pensacola, Florida.

### e.     February 24, 2014 – Title Application

376.   Three days later, on February 24, 2014, King caused KAT Enterprises to apply for a new Certificate of Title to the Western Star Truck in its own name. That day, KAT Enterprises filed a Application for Certificate of Title with/without Registration (the "**February 24, 2014, Application**"). A true and correct of the February 24, 2014, Application is attached to this Complaint as **Exhibit 63**.

377.   The KAT Title Application specifically requested a transfer of title to Western Star Truck. **Ex. 63**.

378.   In the KAT Title Application, KAT Enterprises represented that it acquired the Western Star Truck on February 24, 2014. *Id*. The KAT Title Application represented that KAT Enterprises acquired title by repossession. *Id*.

379.   The KAT Title Application included the following certification:

THIS SECTION REQUIRES A PHYSICAL INSPECTION AND A VERIFICATION OF THE VEHICLE IDENTIFICATION NUMBER (VIN) (OR THE MOTOR NUMBER FOR MOTOR VEHICLES MANUFACTURED PRIOR TO 1955) OF THE MOTOR VEHICLE DESCRIBED ON THIS FORM BY A LICENSED DEALER, FLORIDA NOTARY PUBLIC, POLICE OFFICER, OR FLORIDA DIVISION OF MOTOR VEHICLES EMPLOYEE OR TAX COLLECTOR EMPLOYEE. . . .

*Id*. (capitalization in original).

380.   On February 24, 2014, Ms. Stanley certified that she personally inspected the Western Star Truck and verified the VIN. *Id*.

381.   The KAT Title Application also contained the following certifications:

I CERTIFY THAT THIS MOTOR VEHICLE, MOBILE HOME OR
VESSEL WAS REPOSSESSED UPON DEFAULT IN THE TERMS
OF THE LIEN INSTRUMENT AND IS NOW IN MY
POSSESSION.

\*     \*     \*

I AM REQUESTING THAT AN ORIGINAL CERTIFICATE OF
REPOSSESSION BE ISSUED FOR THE MOTOR VEHICLE FOR
MOBILE HOME IN LIEU OF A TITLE (REPOSSESSION).

*Id*. (capitalization in original).

382.   King signed the KAT Title Application on February 24, 2014, at which

time he made the following declaration:

I/WE PHYSICALLY INSPECTED THE ODOMETER AND I/WE
FURTHER AGREE TO DEFEND THE TITLE AGAINST ALL
CLAIMS. . . . UNDER PENALTIES OF PERJURY, I DECLARE
THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT
THE FACTS STATED IN IT ARE TRUE.

*Id*. (capitalization in original).

383.   On February 24, 2014, the State of Florida issued a Certificate of Title

in the name of KAT Enterprises. A true and correct copy of the February 24, 2014,

Certificate of Title is attached to this Complaint as **Exhibit 64**.

### f.      March 14, 2014 – Transfer to West Florida

384.   Advancing its scheme to defraud Empire, on March 14, 2014, King

caused KAT Enterprises to transfer title to the Western Star Truck to West Florida.

That day, Ms. Stanley executed KAT Enterprises' original Certificate of Title to the

Western Star Truck as the "Seller." A true and correct copy of the Certificate of

Title executed by Ms. Stanley is attached to this Complaint as **Exhibit 65**. Chance King, King's son, signed KAT Enterprises' original Certificate of Title as the "Purchaser." *Id*.

385.   Ms. Stanley and Chance King both certified as follows: "UNDER PENALTIES OF PERJURY, A DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE." *Id*. (capitalization in original).

386.   Then, King caused West Florida to file an Application for Vehicle/Vessel Certificate of Title (the "**West Florida Title Application**") for the Western Star Truck. A true and correct copy of the West Florida Title Application is attached to this Complaint as **Exhibit 66**. The West Florida Title Application recited no consideration or sale price for the transfer of the title to the Western Star Truck from KAT Enterprises to West Florida. **Ex. 66**.

387.   On information and belief, on or about March 18, 2014, West Florida sold and transferred the Western Star truck to Used Car Factory in Bixby, Oklahoma, for $80,000.00.

388.   Nine days later, on March 27, 2014, GB Green Construction filed a Notice of Voluntary Dismissal without Prejudice in the Truck Title Case, dismissing its claims against Empire. A true and correct copy of GB Green

Construction's Notice of Voluntary Dismissal is attached to this Complaint as

**Exhibit 67**.

389.  By the time GB Green Construction filed its Notice of Voluntary

Dismissal, the King Enterprise had:

      a.     Repossessed the Western Star Truck;

      b.     Transported the Western Star Truck across state lines;

      c.     Re-titled the Western Star Truck in the name of KAT

Enterprises and then in the name of West Florida;

      d.     Sold the Western Star Truck across state lines; and

      e.     Transferred money in connection with sale.

390.  By filing the Truck Title Case, Gregory Green and GB Green

Construction prevented Empire from conducting a sale of the Western Star Truck,

thereby enabling KAT Enterprises to exercise its fraudulent rights as a creditor in

connection with the illegal title loan it made to GB Green Construction.

391.  The King Enterprise derived a net financial benefit in excess of

$60,000.00 in connection with its illegal title lending scheme with respect to

Empire as follows:

| Date | Payment/Receipt | Paid By/Paid To | Amount |
|---|---|---|---|
| 3/24/13 | KAT Enterprises | Loan to Gregory Green | ($8,000.00) |
| 10/7/13 | KAT Enterprises | Lien Notice Fees | ($74.75) |
| 2/24/14 | KAT Enterprises | Title application fees | ($85.75) |
| 3/14/14 | West Florida | Title application fees | ($85.75) |
| 3/18/14 | West Florida | Sale of Western Star Truck | $80,000.00 |
| 11/14/14 | Pensacola Indoor Shooting Range | Settlement payment to Empire | ($10,000.00) |
| **Net Benefit to King Enterprise:** | | | **$61,753.75** |

### D.   *The Florida Department of Financial Regulations revoked KAT Enterprises' money transmitting license.*

392.   On April 12, 2013, King and KAT Enterprises entered into that certain Stipulation and Consent Agreement between the State of Florida Office of Financial Regulation and King and KAT Enterprises, as Respondents, in *In re: KAT Enterprises of Pensacola, Inc. d/b/a KAT Check Cashing, and Thomas D. King*, State of Florida Office of Financial Regulation, Administrative Proceeding No. 0765-M-1/13. A true and correct copy of the Stipulation and Consent Agreement is attached to this Complaint as **Exhibit 68**.

393.   According to the Stipulation and Consent Agreement, King and KAT Enterprises violated Fla. Stat. §§ 560.114(1)(e), 560.310, 560.1105, and 560.1235. King and KAT Enterprises also violated Fla. Admin. Code r. 69V-560.704.

394.   The Stipulation and Consent Agreement contemplated that FOFR would revoke KAT Enterprises' check cashing license, License No. FT30800184, upon entry of a Final Order adopting the Stipulation and Consent Agreement.

99

395.    In the Stipulation and Consent Agreement, King and KAT Enterprises

expressly agreed as follows:

> KAT and its principals shall not engage in any activity pursuant to
> Chapter 560, Florida Statutes, which requires a license from the
> Office unless properly licensed. Further, KAT and its principals shall
> not apply for any license pursuant to Chapter 560, Florida Statutes, for
> a period often (10) years from the date of entry of the Final Order
> adopting this Stipulation and Consent Agreement. The fact that KAT
> and its principals are not barred by the terms of this agreement from
> thereafter submitting any such application should not be construed as
> offering any opinion, suggestion, or insinuation concerning whether
> such license might be granted by the Office. Any application will be
> evaluated in the usual statutorily established manner. The facts
> surrounding this Stipulation may be fully considered in any future
> licensing requests. Thomas D. King further agrees that he will not act
> as responsible person for any money services business for a period of
> ten (10) years from the date of entry of the Final Order adopting this
> Stipulation and Consent Agreement.

**Ex. 68**, ¶ 4.c. at 3.

396.    On April 24, 2013, FOFR entered a Final Order adopting and

incorporating the terms of the Stipulation and Consent Agreement. A true and

correct copy of the Final Order is attached to this Complaint as **Exhibit 69**. Upon

docketing the Final Order, FOFR revoked KAT Enterprises' check cashing license.

## COUNT 1 – VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)

397.   The Plaintiffs incorporate by reference Paragraphs 1 through 412 of the Complaint.

398.   The Plaintiffs assert this Count against King, KAT Enterprises, and West Florida (the "**Count 1 Defendants**").

399.   At all relevant times, each Plaintiff was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

400.   At all relevant times, each Count 1 Defendant was a person within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

401.   The Count 1 Defendants formed an association-in-fact for the purpose of employing the acts described in this Complaint to defraud the Plaintiffs. The Count 1 Defendants have functioned as a continuing unit or organization for the purpose of defrauding the Plaintiffs by engaging in illegal title loan lending transactions, illegal transactions as a money transmitter or money services business, bankruptcy fraud, and related wrongful acts to deprive the Plaintiffs of their property and income.

402.   The Count 1 Defendants' association-in-fact was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which was structured through the relationships among the Count 1 Defendants, and at all relevant times, the Count 1 Defendants existed separate and apart from the King Enterprise as a whole.

403.  At all relevant times, and as described in this Complaint, the Count 1 Defendants were engaged in, and their activities affected, interstate commerce.

404.  King is a citizen of the state of the Florida. King is the sole shareholder of KAT Enterprises, and West Florida. KAT Enterprises and West Florida operate their businesses at 6428 Pensacola Boulevard, Pensacola, Florida 32505, on property owned by Pensacola Indoor Shooting Range. KAT Enterprises owns and operates real and personal property situated at 34612 US Highway 98, Lillian, Alabama 36549 and currently conducts business in the State of Alabama as Pensacola Title Loans. KAT Enterprises qualified to do business in the State of Alabama in 2000 and at all relevant times has maintained such qualification. King and KAT Enterprises utilize West Florida as their recovery agent to repossess collateral in Florida and Alabama for title loans purportedly made in Alabama. King is and at all relevant times has been KAT Enterprises' registered agent in both Florida and Alabama.

405.  At all relevant times, the Count 1 Defendants and others associated with the King Enterprise agreed to and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of Civil RICO, 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding the Plaintiffs and others.

102

406.   Pursuant to and in furtherance of their fraudulent scheme, the Count 1 Defendants committed multiple related acts of bankruptcy fraud under 18 U.S.C. § 152; mail fraud under 18 U.S.C. § 1341; racketeering under 18 U.S.C. § 1952; money laundering under 18 U.S.C. § 1956; engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957; unlicensed money transmitting under 18 U.S.C. § 1960; transportation of stolen vehicles under 18 U.S.C. § 2312; sale or receipt of stolen vehicles under 18 U.S.C. § 2313; and violations of the Currency and Foreign Transactions Reporting Act, or the Bank Secrecy Act, under 31 U.S.C. §§ 5311-5330. Thus, the Count 1 Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the actions as set forth in this Complaint. Each of the Count 1 Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

407.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The foregoing actions were related to each other by virtue of common participants, common victims (the Plaintiffs), common methods of commission, and the common purpose and common result of defrauding the Plaintiffs and depriving them of the valuable property while enriching the Count I defendants while disguising or concealing their illegal activities. The King Enterprise's actions

103

described above are not isolated events; they commenced as early as 2004 and continue presently. Moreover, given their nature and duration, the actions of the King Enterprise pose a threat of continuing criminal conduct.

408.   The Count 1 Defendants voluntarily and knowingly conducted and participated, directly or indirectly, in the conduct of the King Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), as described throughout this Complaint.

409.   Each Count 1 Defendant engaged in at least two acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1), one of which occurred after the effective date of Civil RICO and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

410.   As a direct and proximate result of the Count 1 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiffs have injured in their business and property.

411.   The damages suffered by the Plaintiffs were and are foreseeable, natural, direct, and intended consequence of the Count 1 Defendants' scheme to defraud the Plaintiffs and others.

**WHEREFORE**, the Plaintiffs demand judgment against the Count 1 Defendants (a) awarding money damages in an amount to be determined by a jury;

(b) awarding treble damages pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c); (c) awarding attorney's fees and the costs of this action; and (d) granting any other relief to which the Plaintiffs may be entitled.

## COUNT 2 – RICO CONSPIRACY, 18 U.S.C. § 1962(d)

412.   The Plaintiffs incorporate by reference Paragraphs 1 through 412 of the Complaint.

413.   The Plaintiffs assert this Count against King, KAT Enterprises, West Florida, KTTTC Investments, and Terra Gulf Coast (the "**Count 2 Defendants**").

414.   At all relevant times, each Plaintiff was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

415.   At all relevant times, each Count 2 Defendant was a person within the meaning of 18 U.S.C. § 1961(3) and 1962(d).

416.   The Count 1 Defendants formed an association-in-fact for the purpose of employing the acts described in this Complaint to defraud the Plaintiffs. The Count 1 Defendants have functioned as a continuing unit or organization for the purpose of defrauding the Plaintiffs by engaging in illegal title loan lending transactions, illegal transactions as a money transmitter or money services business, bankruptcy fraud, and related wrongful acts to deprive the Plaintiffs of their property and income.

417.   The Count 1 Defendants' association-in-fact was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which was structured through the relationships among the Count 1 Defendants, and at all relevant times, the Count 1 Defendants existed separate and apart from the King Enterprise as a whole.

418.   At all relevant times, and as described in this Complaint, the Count 2 Defendants were engaged in, and their activities affected, interstate commerce. King is a citizen of the state of the Florida. King is the sole shareholder of KAT Enterprises, and West Florida. KAT Enterprises and West Florida operate their businesses at 6428 Pensacola Boulevard, Pensacola, Florida 32505, on property owned by Pensacola Indoor Shooting Range. KAT Enterprises owns and operates real and personal property situated at 34612 US Highway 98, Lillian, Alabama 36549 and currently conducts business in the State of Alabama as Pensacola Title Loans. KAT Enterprises qualified to do business in the State of Alabama in 2000 and at all relevant times has maintained such qualification. King and KAT Enterprises utilize West Florida as their recovery agent to repossess collateral in Florida and Alabama for title loans purportedly made in Alabama. King is and at all relevant times has been KAT Enterprises' registered agent in both Florida and Alabama.

419.   The Count 2 Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of

racketeering activity in an interstate enterprise, acquire or maintain interests in the

enterprise through a pattern of racketeering activity, and conduct and participate in

the conduct of the affairs of the enterprise through a pattern of racketeering

activity. The Count 2 Defendants knew that their predicate acts were part of a

pattern of racketeering activity and agreed to the commission of those acts to

further the schemes described above. The Count 2 Defendants' conduct constitutes

a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. §

1962(d).

420.   As a direct and proximate result of the Count 2 Defendants'

racketeering activities and violations of 18 U.S.C. § 1962(d), the Plaintiffs have

been injured in their business and property. Furthermore, the Plaintiffs have been

forced to expend substantial amounts of money, time, and effort investigating the

scheme at large.

421.   The damages suffered by the Plaintiffs were and are foreseeable,

natural, direct, and intended consequence of the Count 2 Defendants' scheme to

defraud the Plaintiffs and others.

**WHEREFORE**, the Plaintiffs demand judgment against the Count 2

Defendants (a) awarding money damages in an amount to be determined by a jury;

(b) awarding treble damages pursuant to the civil remedy provisions of 18 U.S.C. §

1964(c); (c) awarding attorney's fees and the costs of this action; and (d) granting any other relief to which the Plaintiffs may be entitled.

## COUNT 3 – VIOLATION OF FLORIDA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATION) ACT, FLA. STAT. §§ 895.01 TO .06

422.    The Plaintiffs incorporate by reference Paragraphs 1 through 412 of the Complaint.

423.    The Plaintiffs assert this Count against King, KAT Enterprises, and West Florida (the "**Count 3 Defendants**").

424.    The Count 3 Defendants formed an association-in-fact for the purpose of employing the acts described in this Complaint to defraud the Plaintiffs. The Count 3 Defendants have functioned as a continuing unit or organization for the purpose of defrauding the Plaintiffs by engaging in illegal title loan lending transactions, illegal transactions as a money transmitter or money services business, bankruptcy fraud, and related wrongful acts to deprive the Plaintiffs of their property and income.

425.    The Count 3 Defendants' association-in-fact was an "enterprise" within the meaning of Fla. Stat. § 895.02(5), which was structured through the relationships among the Count 3 Defendants, and at all relevant times, the Count 3 Defendants existed separate and apart from the King Enterprise as a whole.

426.   Pursuant to and in furtherance of their fraudulent scheme, the Count 1 Defendants engaged in multiple related acts of "racketeering activity" within the meaning of Fla. Stat. 895.02(8)(a), including, without limitation, crimes chargeable under Fla. Stat. § 560.111(1)(a), (1)(c), and (1)(d); Fla. Stat. §§ 831.01 and .02; and the Florida Money Laundering Act, Fla. Stat. § 896.101. In addition, as set forth in this Complaint, the Count 3 Defendants engaged in multiple related acts of "racketeering activity" within the meaning of Fla. Stat. 895.02(8)(b), including, without limitation, the acts of "racketeering activity" set forth in Count 1 of this Complaint. Each of the Count 3 Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

427.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(7). The foregoing actions were related to each other by virtue of common participants, common victims (the Plaintiffs), common methods of commission, and the common purpose and common result of defrauding the Plaintiffs and depriving them of the valuable property while enriching the Count 3 defendants while disguising or concealing their illegal activities. The King Enterprise's actions described above are not isolated events; they commenced as early as 2004 and continue presently. Moreover, given their nature and duration, the actions of the King Enterprise pose a threat of continuing criminal conduct.

428.   At all relevant times, the Count 3 Defendants and others associated with the King Enterprise agreed to and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of Florida RICO, Fla. Stat. 895.02(7), in violation of 895.03(3) for the unlawful purpose of defrauding the Plaintiffs and others.

429.   Each Count 3 Defendant engaged in at least two acts of racketeering activity within the meaning of Fla. Stat. § 895.02(7), one of which occurred after October 1, 1977,  and the last of which occurred within five years after the commission of a prior act of racketeering activity.

430.   As a direct and proximate result of the Count 3 Defendants' racketeering activities and violations of Fla. Stat. § 895.03(3), the Plaintiffs have been injured in their business and property.

431.   The damages suffered by the Plaintiffs were and are foreseeable, natural, direct, and intended consequence of the Count 3 Defendants' scheme to defraud the Plaintiffs and others.

**WHEREFORE**, the Plaintiffs demand judgment against the Count 3 Defendants (a) awarding money damages in an amount to be determined by a jury; (b) awarding attorney's fees and the costs of this action; and (c) granting any other relief to which the Plaintiffs may be entitled.

110

## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

>                    */s/ Jason Michael Osborn*
>                    Jason Michael Osborn (ASB4122A58O)
>                    OSBORN GROUP, LLC
>                    61 St. Louis Street, Suite 1301
>                    Mobile, Alabama 36602
>                    Telephone: (251) 929-5050
>                    Email: josborn@osborngroupllc.com
>
>                    Counsel for Plaintiffs